STATE of Tennessee, Appellee,

v.

Gregory THOMPSON, Appellant.

Supreme Court of Tennessee,
at Nashville.

Feb. 27, 1989.

H. Thomas Parsons, Doyle E. Richardson, Manchester, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, Charles S. Ramsey, Jr., Dist. Atty. Gen., J.W. Luna, Asst. Atty. Gen., Manchester, for appellee.

## OPINION

DROWOTA, Chief Justice.

In this direct appeal Gregory Thompson seeks review of his conviction for first degree murder and the capital sentence imposed in a jury trial.

The essential facts of the case are not in dispute. On December 29, 1984, Thompson and Joanne McNamara, a juvenile female, traveled by bus from Marietta, Georgia, to Shelbyville in Bedford County, Tennessee. They presented themselves as a married couple at the home of Willa Mae Odum, an acquaintance of McNamara's family who allowed them to stay. Ms. Odum learned the two were not married and asked Thompson to leave, but he remained through the night of December 31, waiting for a relative to wire him funds for a bus ticket. The following morning, January 1, Ms. Odum again insisted that Thompson leave, and she called the authorities to report that Joanne was a runaway. This call apparently prompted their departure. The couple, having little money and no transportation, spent the afternoon at a nearby Wal–Mart store.

Late that same afternoon, January 1, 1985, Brenda Lane, a local resident, made several purchases at the Wal–Mart, and did not arrive home when expected. Shortly after midnight her yellow Chevrolet was reported on fire near an apartment building in Marietta, Georgia. Thompson and McNamara were arrested by Cobb County authorities in connection with this investigation on the night of January 2. A traffic ticket in Thompson's jacket showed he had been cited for speeding, while driving Mrs. Lane's vehicle, at 8:25 p.m. on Interstate 24 near the Jasper–South Pittsburgh exit, the last exit before the Georgia line. A Wal–Mart receipt and several items in the vehicle indicated a purchase at that store at 5:51 p.m. January 1. A button found in the car matched those on Thompson's clothing.

A few hours later, while in custody, Thompson gave a statement admitting that he had abducted a woman at knifepoint from the Wal–Mart location in Shelbyville and had forced her to drive him and his companion, in her car, to a remote location outside Manchester, Tennessee. There he had stabbed her, driven the car over her body, and left her. He and McNamara had returned to Marietta and attempted to burn the vehicle. He also drew a map illustrating the route from the town to the site of the stabbing and describing several structures and other features along the way. He spoke on the phone with authorities in Manchester to clarify his directions.

In the early morning hours of January 3, a team of searchers following Thompson's directions found Brenda Lane at the place indicated in his statement. She was dead from multiple stab wounds to her back. Two of the four wounds had been fatal, penetrating her right lung and causing her to bleed to death. A forensic pathologist testified that she would not have died immediately, but would have remained conscious for five to ten minutes. At the scene she lay on her back, her body arched, her heels dug into the ground. One hand clutched several blades of grass, and the other held a tissue. There was no evidence she had, in fact, been run over by a vehicle. There was no evidence of a struggle, and apart from the stab wounds Ms. Lane was not injured.

A week later a road crew from the Coffee County jail found a rusty 12⅝ inch knife along the route to the scene of the stabbing. It was not connected to the stabbing by any scientific evidence, but it resembled a knife that Thompson had shown to persons at the Odum residence.

Finally, the state trooper who had issued the speeding ticket to Thompson on the night of January 1 described him as "cool, calm, and collected." Thompson had borrowed a cigarette from him and in no way generated any suspicion. The stop was "ordinary."

The defendant presented no proof in the guilt/innocence phase of the trial.

At the sentencing hearing the State relied on its proof at the guilt phase. The defendant presented several witnesses who presented an unchallenged picture of him as a non-violent, co-operative, responsible young person through his school years, until he joined the Navy, and rather ambiguous behavior during his military service.

Several former teachers and acquaintances who had known him before he had left his home in Pike County, Georgia, in 1979 to join the Navy testified that he had a good reputation and had been a good student, who was "pleasant, easy-going, cheerful." His grandmother, who had raised him after his father left the family and his mother died in 1966, and his step-grandfather testified that he had been a normal, obedient, and hardworking child. The defendant's brother, sister, and cousin testified about their childhood. While the family was poor, it was also good and loving.

Defendant's girlfriend from this period of his life, Arlene Cajulao, testified that he was sensitive and caring. She told how he had suffered a head injury when three of his fellow service men attacked him with a crowbar and how he had become unreasonably fearful afterwards. Cajulao testified that Thompson had been court martialed for shoving a petty officer and either dislocated the officer's shoulder or broke his collar bone. She admitted knowing of other violent incidents between the defendant and other Navy personnel.

The Defendant had apparently returned to Georgia in 1983 and 1984 to look for work. His sister and her husband testified about his activities at this time and about his relationship with Joanne McNamara, whose mother, defendant claimed, was trying to force her into prostitution. Defendant had spoken with his sister after his arrest and expressed concern for his grandmother.

Dr. George Copple, a clinical psychologist who had interviewed and tested the Defendant, testified about his personality and capabilities for employment in prison. In Dr. Copple's opinion Thompson had a strong need for nurturance (to meet the needs of other persons). This protective attitude toward McNamara, plus a feeling that his options were limited had played a part in the killing. To this expert Defendant seemed remorseful, was not a "con artist" or malingerer, and did not have an adult anti-social personality.

In rebuttal of Dr. Copple's testimony the State presented the deposition of Dr. Robert Glenn Watson, a clinical psychologist at the Middle Tennessee Mental Health Institute, who had participated in a staff evaluation of Defendant shortly after the arrest. Defendant, in the staff's opinion, exhibited an adult anti-social behavior. He was not remorseful and showed little or no emotion about the crime. During the period of evaluation, Defendant appeared to "malinger" schizophrenia, claimed to hear voices, and falsely claimed he was unable to read and write although he had attended college level courses in Hawaii and been a B student in high school.

In imposing the death penalty in this case the jury found three aggravating circumstances: 1) the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; 2) the defendant committed the murder for the purpose of avoiding or preventing his lawful arrest and prosecution; and 3) the murder was committed while the defendant was engaged in committing robbery or kidnapping. T.C.A. § 39–2–203(i)(5), (6) and (7).

The appeal on this case presents numerous issues concerning the effective assistance of counsel, the composition and selection of the jury, the admissibility of evidence, and the constitutionality of the statute and jury instructions under which Defendant was sentenced. We examine these questions as they arose in the course of the proceedings.

Defendant claims first that he was denied the effective assistance of counsel because his attorneys were disqualified by a conflict of interest. The record shows the trial court appointed two attorneys, John W. Rollins and H. Thomas Parsons. Both quickly moved to withdraw, Mr. Rollins because he was the Coffee County Attorney, and Mr. Parsons because he was representing the Coffee County Sheriff in an unrelated civil matter in federal district court. Mr. Rollins did not confer with Defendant and took no part in his representation; and on April 9, 1985, he was relieved of the appointment. On the same day, Mr. Doyle Richardson was substituted as co-counsel, and he has continued as such through this appeal. No complaint is made about his representation.

On June 20, 1985, Mr. Parsons was also relieved as counsel by order of the Court of Criminal Appeals because of the possibility that the Sheriff's subordinates would give material testimony at trial. On July 5, 1985, Mr. Richardson moved on behalf of Defendant to have Mr. Parsons re-appointed, asserting the conflict had been resolved by the settlement of the Sheriff's civil suit. On July 10, 1985, the Court of Criminal Appeals ordered his re-appointment.

These matters were thoroughly litigated in the trial court. As anticipated, only one Sheriff's employee appeared at trial, and his testimony was limited to establishing the chain of custody of the knife found by the road crew. Moreover, the investigation was conducted, for the most part, by the Tennessee Bureau of Investigation, not the local sheriff's office. *See State v. Jones,* 726 S.W.2d 515 (Tenn.1987).

 Plainly, an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest. To establish a denial of the sixth amendment right to counsel, it is sufficient to show that an actual conflict existed. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333 (1980). If an attorney actively represents conflicting interests, no analysis of prejudice is necessary; it is presumed that his divided interests adversely affected his representation. *See Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). But as counsel conceded, the conflict claimed here was only a potential one and quite remote; and it was resolved before trial. Without a showing of prejudice—and an attorney's good faith assertion of his disqualification is not in itself ineffective representation—there is no denial of counsel.

Neither is any prejudice apparent in this record from counsel's lack of experience in capital cases or from co-counsel Rollins' non-participation or from inadequate compensation to Defendant's court-appointed attorneys.[1] While it is understandable that counsel would second-guess their decisions in a case such as this, these and related questions are more appropriately raised by other counsel when the present attorneys are relieved of their advocacy role.

 Defendant's motion to quash the indictment on grounds the grand jury was not impaneled, and its foreman appointed, in conformity with T.C.A. § 16–2–510 was properly denied. The statute relied on is plainly a directive to order the administrative duties of the judges within their judicial districts. It is enacted for the benefit of the public at large, not a particular accused, and in the absence of corruption, fraud, bias, disqualification, or other illegality infecting the grand jury an irregu-

---

1. In *State v. Simon,* 635 S.W.2d 498, 503 (Tenn. 1983), we required a showing of prejudice, even where inexperienced counsel was appointed. Both Mr. Richardson and Mr. Doyle had actively practiced law for twenty or more years. Both had trial experience with serious felony cases, Mr. Richardson more recently. In the report of the trial judge, Tenn.R.Sup.Ct. 12, he states that "appointed counsel afforded the defendant as vigorous and thorough defense as the undersigned trial judge has observed in a lifetime of exposure to the legal system."

larity in its selection does not invalidate its acts. *Flynn v. State*, 203 Tenn. 337, 313 S.W.2d 248 (1958). Similarly, the fact that a jury commissioner may not have selected a tentative list of jurors in the presence of other commissioners, *see* T.C.A. § 22-2-302(a)(1), is not, without more, grounds to quash the venire.

■ Defendant also challenged the composition of the jury on the grounds it did not reflect a fair cross-section of the community, as guaranteed by sixth amendment. He particularly asserts that black people, women, young people, persons not registered to vote, and an unnamed religious group were underrepresented. To establish a prima facie violation, it must be shown 1) that the allegedly excluded group is a distinctive group in the community; 2) that its representation on the venire is not fair and reasonable in relation to its numbers in the community; and 3) that the underrepresentation resulted from systematic exclusion. *Duren v. Mississippi*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

Of the allegedly excluded groups only black persons and women meet the first criterion. Although it is possible as a matter of proof to show that others are cognizable groups in a community, it has not been done in this record. *Cf. State v. Nelson*, 603 S.W.2d 158 (Tenn.Cr.App. 1980).

■ With respect to the second criterion, the defendant, who was black, has shown the Coffee County population is 96% white and 3.4% black; it is 48.8% male and 51.2% female. The venire of three hundred and ten included six black persons (1.9%); 57% were male and 43% were female. Assuming these percentages relate to the population qualified to serve as jurors, we do not find the representation either unfair or unreasonable. We are cited to no authority that the disparities shown are legally significant, and the record contains no expert analyses that they are statistically significant. Numerical evidence about the group actually served by the sheriff, those answering questionnaires, and those finally selected to serve at this trial are not rele-

vant. In addition, the use of a voter registration list is not a "political test," and there are no data in this record to show that it is an inadequate or discriminatory source of names of potential jurors. *See State v. Caruthers*, 676 S.W.2d 935 (Tenn. 1984).

■ Defendant also raises several issues about the voir dire. He insists that seven of the jurors examined should have been excused for cause, four because of their inability to consider a life sentence, and three for other reasons. The record shows that one of the seven was removed for cause and six were peremptorily challenged by Defendant. Of these six, we find only two whose responses on the question of punishment were seriously ambiguous, and another who was acquainted with an immaterial witness. But any error in not excusing these potential jurors is harmless because they were not forced upon Defendant at the trial. There is no claim, and the record does not show, that the jury who heard the case was not fair and impartial. This rule was thoroughly discussed in *State v. Simon*, 635 S.W.2d 498, 568-10 (Tenn.1982), and applied in *Turner v. State*, 111 Tenn. 593, 610-614 (1902), upon which Defendant relies. It was approved in *Ross v. Oklahoma*, 487 U.S. ——, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Defendant's suggestion that the trial court systematically deprived him of his fifteen challenges is not supported by the record. *See Ross*, 108 S.Ct. at 2280 n. 5.

■ We find no error in the excusal of prospective juror Roberts because of his scruples about the death penalty. This gentleman made clear that his unequivocal opposition to capital punishment would prevent him from following the instructions of the court. He was therefore excusable for cause under the standard in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985). Two other jurors were properly excused for private reasons.

■ Finally, Defendant has shown no denial of equal protection in the State's peremptory challenge of the single black person called for examination in the voir

dire. Although this case was tried before the decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), counsel made a timely objection. The trial court applied the pre-*Batson* rule and required no response from the State at that time. The matter was argued and evidence was presented at the hearing on motion for a new trial.

*Batson* forbids the state to exercise a peremptory challenge intentionally to remove a potential juror because of his race. A defendant of the same race as the allegedly excluded group has standing to object. If he presents a prima facie case of discrimination, by direct evidence or a pattern of strikes or other relevant evidence, the burden shifts to the State to provide a racially neutral, rational explanation for the challenge.

The only evidence of discrimination here is the challenge of the only black person seated. Whether this is a pattern of strikes sufficient to establish a prima facie case we need not decide because the State provided a satisfactory explanation. *See State v. Bell*, 759 S.W.2d 651 (Tenn.1988). In answering a questionnaire for members of the venire, Mr. Walker expressed doubts about the efficacy of the death penalty, as he did during the voir dire. There being nothing in the record to suggest otherwise, we accept this as a rational and racially neutral basis for the challenge.

Defendant presents several issues concerning the admission and exclusion of evidence. The first concerns statements he made to authorities while in custody. Thompson was arrested on January 2 in Marietta, Georgia, and transported to the local police department. He was advised of his rights, and made an initial admission to an agent of the Tennessee Bureau of Investigation that he had been in Shelbyville and bought the vehicle found on fire.

It is undisputed that Defendant then invoked his right to counsel and all questioning ceased. T.B.I. Officer Eubank then consulted with a local detective about securing counsel, and Detective Parker called, in turn, a judge and District Attorney General Tom Charron. General Char-

ron came to the department and introduced himself to Defendant at 11:30 p.m. According to his testimony, he understood that Thompson had asked to see him. He identified himself as a prosecutor and repeatedly advised Defendant of his right not to speak. He explained that counsel would be appointed at arraignment at eight o'clock in the morning.

Defendant testified that he asked Charron advice in the form of hypothetical questions ("If you were my lawyer ...?), and Charron advised him to tell the truth. There is no claim that the Attorney General asked any questions or that Thompson made any statements during this conversation, which ended after fifteen minutes. At 1:15 a.m., as he admitted in the hearing, Thompson asked to speak to this attorney again. Attorney General Charron re-entered the room, identified himself again, but did not give new "Miranda" warnings. Thompson then, and later, confessed to the kidnapping-stabbing and drew a map to the scene. His statements, the map, and resulting evidence were introduced at trial.

■ Defendant claims a violation of his fifth amendment right to counsel during custodial interrogation. The clear rule is that once an accused in custody invokes his right to counsel, all questioning must cease until counsel has been provided. *Miranda v. Arizona*, 384 U.S. 436, 439, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Although an accused may subsequently waive his right to counsel, the State bears a heavy burden to show he initiated further conversation with police, and that his waiver was voluntary and intelligent. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044–45, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983).

■ The question raised in this case is whether the Attorney General's action in presenting himself to Defendant to explain when and where an attorney would be provided, was calculated to, or did, elicit incriminating statements, or induce Defendant to waive his asserted rights. *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It was

Defendant's theory, but not his testimony, that he was deceived and thought the prosecutor was his own counsel. The trial court expressly rejected this claim, noting that Defendant was both intelligent and articulate and admitted General Charron had identified himself as a prosecutor. This finding is supported by Thompson's own account of his hypothetical inquiries, which in themselves show his knowledge, and we agree there was no deception in this case. Defendant clearly initiated the interview an hour and a half later, and the circumstances show that Defendant understood his right to counsel and his right to remain silent and that he voluntarily relinquished them.

■ Defendant also complains of the showing at trial of a videotape of the route from Interstate 24, through Manchester, to the scene of the killing. The tape was relevant to show the accuracy of Defendant's memory, his presence of mind during the episode, and the time available to him for contemplation. We have viewed this recording, and while the caption "Death of Brenda Lane" should have been concealed from the jury, we do not find the recording inflammatory or otherwise unfairly prejudicial.

■ Several complaints are made about the admission and exclusion of evidence in the sentencing hearing. The principal issue is the admissibility of a psychiatric/psychological report to rebut Defendant's own expert.

The much redacted report was introduced by the State in rebuttal, through the deposition of Dr. Watson, a clinical psychologist. Dr. Watson was a member of a team at Middle Tennessee Mental Health Institute, where Defendant was sent, on his own motion, for a thirty-day evaluation. The examination was requested to determine his competence to stand trial, his mental condition at the time of the offense, and his committability to a mental health institution.[2]

Defendant contends the use of this evaluation violates his fifth amendment privilege against self-incrimination, his sixth amendment right to counsel, and his statutory privilege protecting communications to a psychologist. He objects particularly to evidence that he exhibited no remorse and that he "malingered" a mental illness.

The constitutional claims are predicated on the decision in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a capital case in which the Supreme Court held the State may not establish an aggravating circumstance by use of an evaluation ordered on motion of the court or the prosecutor and without full notice to and consultation with counsel. The opinion noted two exceptions: the evidence is not admissible unless the defendant requests the evaluation and introduces evidence of his mental status at the trial. Both are present in the case before us, and were recently elaborated in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). In *Buchanan* it is suggested that even when an exception is present the evidence may be used only to rebut or impeach defendant's proof and if it is the only means of doing so; it may not include incriminating statements about the crime; and it must not exceed the scope of the purpose for which the evaluation was requested. To this extent a defendant has waived the privilege against self-incrimination by requesting the examination. Where the evaluation is requested through a defendant's attorney, there is no denial of defendant's right to consult his counsel.

All of these limitations were observed in this case. Defendant's expert testified broadly about his "abilities, motivations, and personality" and offered a lengthy opinion on his motivations during the offense. He observed remorse in Defendant and evaluated his vocational aptitudes. The State was entitled to rebut this evidence and also to impeach Defendant's expert opinion by showing Defendant had pretended a mental illness. We find no constitutional error in the admission of Dr. Watson's deposition.

---

**2.** He was found competent, sane at the time of the crime, and not committable.

■ Moreover, the team report was not subject to a hearsay objection when Defendant clearly had notice and, in fact, elicited explanatory testimony from Dr. Copple. *See* T.C.A. § 39–2–203(c). We also hold the statutory privilege, T.C.A. § 63–11–213, was waived.

■ We further find no reversible error in the State's cross-examination of Defendant's witnesses in the sentencing hearing. Ms. Cajulao testified about Defendant's experiences in the Navy and implied his problems were either accidents or the fault of others. The State then cross-examined, using documents of the adjudications in a court martial. This was fair cross-examination, and the documents were far more reliable than mere arrest reports and not patently inadmissible. *Cf. State v. Sheffield,* 676 S.W.2d 542, 551–53 (Tenn.1984).

■ It was improper to allude to Defendant's difficulty in the Navy in cross-examination of witnesses who had no familiarity with this period of Defendant's life; but because the reference was minor and the subject was already before the jury, it does not require reversal. Similarly, parts of a letter Defendant wrote to a female inmate were irrelevant to rebut or impeach Dr. Copple's testimony, but were not so inflammatory as to affect the verdict.

■ Defendant next contends that evidence offered in mitigation was erroneously excluded as irrelevant. This evidence from Dr. Wheaton, a criminologist and prison chaplain, included opinion about the deterrent effect of capital punishment, the positions of various religious denominations on the penalty, and the relationship between violent crime and the age of the offender.

The ultimate penalty may be imposed only upon an individualized sentencing determination and only if the jury is allowed to hear all relevant evidence about the circumstances of the crime and the history and character of the defendant that may mitigate the punishment. *Skipper v.*

*South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed. 2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). T.C.A. § 39–2–203(j) instructs the jury to consider "any mitigating circumstances," and subpart (7) lists as a mitigating factor "the youth or advanced age of the defendant at the time of the crime."

The question presented is whether Dr. Wheaton's evidence is relevant to the statutory factors or any others proposed by Defendant. The first two categories clearly are not. We have previously held that general information about the deterrent value and moral rightness of capital punishment are not pertinent in making an individualized judgment about the particular crime or defendant. *See State v. Johnson,* 632 S.W.2d 542, 547–48 (Tenn.1982).

Defendant insists the third part of Dr. Wheaton's testimony is made relevant by his age at the time of the offense, twenty-three years, and by the listing of "youth" as a statutory mitigating factor.[3] Dr. Wheaton would have presented statistical evidence that persons between the ages of 18 and 25 are more likely to commit crime than persons of other ages, and, in particular, to be convicted of murder. He also would have testified that this age group exhibits the least "container behaviors"; that is, they are less likely to "contain" sudden outbursts of anger. There is no evidence that Dr. Wheaton had interviewed the Defendant or even reviewed his history or psychological reports. Nor is there any evidence that this crime occurred in a sudden outburst of anger. Accordingly, we agree with the trial court that this evidence had no probative value on the circumstances of *this* crime or the character of *this* defendant, and hold that it was properly excluded.

■ In several issues Defendant complains of instructions not given at the close of the sentencing hearing. Only one, the missing witness instruction as to

---

**3.** We have not considered the testimony of the jury foreman about the jury deliberations. Under the well-established rule in this state, a court may not receive evidence in impeachment of the verdict. *See Montgomery v. State,* 556 S.W.2d 559 (Tenn.Cr.App.1977).

Joanne McNamara, was requested, and it was plainly not appropriate. A party requesting this instruction must show, among other things, that the witness is available to testify. *See generally, State v. Francis,* 669 S.W.2d 85, 89 (Tenn.1984). Defendant concedes that McNamara was also charged with the murder. In this circumstance, there is no presumption the witness would testify at all, and the burden is on the proponent of the instruction to demonstrate that she would. Defendant did not do so, and was therefore not entitled to the requested instruction.[4] Other omissions assigned as error on appeal were not preserved by request in the trial court. The jury was fully instructed about its general duties at the close of the trial. The instructions at the sentencing phase focussed particularly on capital sentencing matters. In the absence of a special request, the trial court need not repeat the original charge or submit it in writing to the jury so long as the jury is adequately instructed on the issues presented for their determination in the sentencing hearing. Finally, the omission of an instruction on Defendant's good character, potential for rehabilitation, and motivation is not error. The court should not instruct on non-statutory mitigating factors. *State v. Hartman,* 703 S.W.2d 106 (Tenn.1985).

■ As to matters pertaining to capital sentencing, we conclude this jury was correctly and adequately instructed. Two arguments made by Defendant require some elaboration. He first insists that the jury in this case was required to agree unanimously on the existence of mitigating circumstances, and thereby one or more jurors might have been precluded from considering evidence he or she deemed mitigating in the ultimate determination. In *Mills v. Maryland,* —— U.S. ——, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), it was held that such a result would contravene the eighth amendment.

The instructions in this case parallel the language and structure of T.C.A. § 39-2-203, which provides:

(f) If the jury unanimously determines that no statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, or if the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proved by the state beyond a reasonable doubt but that said circumstance or circumstances are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment. The jury shall then return its verdict to the judge upon a form provided by the court which may appear substantially as follows: ...

(1) We, the jury, unanimously find that the punishment shall be life imprisonment.

(g) If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death. If the death penalty is the sentence of the jury, the jury shall:

(1) Reduce to writing the statutory aggravating circumstance or statutory aggravating circumstances so found; and

(2) Signify that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances so found. These findings and verdict shall be returned to the judge upon a form provided by the court which may appear substantially as follows: ...

(1) We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances:

[Here list the statutory aggravating circumstance or circumstances so found]

(2) We, the jury, unanimously find that there are no mitigating circumstances

---

4. To show that McNamara was physically available to the State, Defendant refers us to a presentence report in the record. That report

shows that on advice of counsel, McNamara refused to make a statement to a probation officer.

sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances so listed above.

(3) Therefore, we, the jury, unanimously find that the punishment shall be death.

This method includes none of the objectionable features of the instructions in *Mills*. As can be seen, the jury is not required to list, much less agree on, the existence of any mitigating facts, and the jury was so charged in this case. The trial court emphasized the juror's autonomy in considering mitigating evidence by instructing, "Because different people may have different views about what tends to ameliorate or mitigate ... you may weigh and consider any and all circumstances which you feel tend to mitigate the offense or defendant in question." There is no merit to this issue.

A second complaint concerns the instruction that the sentence shall be death if the jury determines that aggravating circumstances "are not outweighed by any sufficiently substantial mitigating circumstances," and that the punishment shall be life imprisonment if the jury determines that a statutory aggravating circumstance or circumstances "are outweighed by one or more mitigating circumstances." Comparable language appears in T.C.A. § 39–2–203(f) and (g), set out above.

The defendant insists that this phrasing places a burden on the defendant to demonstrate that death is not the appropriate penalty, and that this burden is a denial of due process under *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

■■■ As the Supreme Court has observed, the listed aggravating circumstances serve two functions in our sentencing scheme. *Zant v. Stephens*, 462 U.S. 862, 875 and n. 13, 103 S.Ct. 2733, 2742 and n. 13, 77 L.Ed.2d 235 (1983). The first is to narrow the class of homicides for which a capital sentence may be imposed. The second is to provide, and in this State to limit,[5]

the negative information which the sentencer weighs in the ultimate determination of punishment. In its first function the statute does place the burden on the State to prove one or more aggravating circumstances, and to do so beyond a reasonable doubt. In our view this allocation and standard of proof is constitutionally required at this stage because a convicted person is thereby subjected to a wholly new punishment and because any lesser standard presents an unacceptable risk of error. *Cf. McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

■■■ Defendant maintains these same standards are required for the second, discretionary, stage of the sentencing decision. The United States Supreme Court has not so held. Rather, the eighth amendment requires that once the class of homicides is genuinely narrowed, the sentencer must be allowed discretion to impose a lesser punishment and he must not be precluded from considering any relevant mitigating evidence. *See Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 554–555, 98 L.Ed.2d 568 (1988). In the eighth amendment context, the question presented is whether the instruction that mitigating circumstances *not outweigh* aggravating circumstances precludes the sentencer from considering any relevant mitigating circumstances proffered by the defendant, or whether it creates a "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Mills v. Maryland*, —— U.S. ——, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988) (quoting *Lockett v. Ohio*, 438 U.S. 586, 605; 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978)).

Similar instructions have been analyzed, with differing results, in *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988) (en banc) (facially unconstitutional); *Foster v. State*, 304 Md. 439, 499 A.2d 1236 (1985) (not unconstitutional), and *State v. Biegenwald*, 106 N.J. 13, 524 A.2d 130 (1987) (replaced

---

**5.** Except in rebuttal the State is limited to proof on the statutory circumstances, T.C.A. § 39–2–203(e), and may not rely on any others

in argument. *Cozzolino v. State*, 584 S.W.2d 765 (Tenn.1979).

by retroactive legislation). It appears that in each of these cases the sentencer could consider mitigating facts only if they were first shown by a preponderance of the evidence or the sentencer was instructed to impose the death penalty unless he was convinced by a preponderance of the evidence that mitigating factors outweighed aggravating factors.

T.C.A. § 39–2–203 places no evidentiary hurdle in the way of establishing mitigating facts; nor does it assign any standard for weighing mitigation against the aggravating circumstances. Each juror has discretion to determine the degree to which the proof mitigates against the death penalty, and whether it is "sufficiently substantial" to call for a lesser sentence, T.C.A. § 39–2–203(g)(2) and § 39–2–205(c)(3). We are convinced that in this context, the phrasing does not operate to preclude consideration of any relevant mitigating factors and that it satisfies the constraints of the eighth amendment.

 In several issues Defendant questions the sufficiency of the evidence to support the jury's findings that the murder was committed to prevent the lawful apprehension of Defendant and his companion, T.C.A. § 39–2–203(i)(6), and that the murder was especially heinous, atrocious, and cruel, T.C.A. § 39–2–203(i)(5). There can be no reasonable doubt that the surviving victim could have identified the twosome and raised an alarm, after the theft of her car, and there is nothing in Defendant's statement, the physical evidence, or any other circumstances to suggest another purpose for the killing. *See State v. Coe,* 655 S.W.2d 903, 913 (Tenn.1983). The record is sufficient to establish this aggravating circumstance.

 The proof also establishes an especially cruel murder involving torture or depravity of mind. It shows a particularly senseless killing indicative of depravity of mind. The victim was driven some distance into rural Tennessee, stabbed multiple times and left alive, conscious, and alone to die on a winter night. It is highly probable she knew her fate in advance. There is evidence she was crying, and Defendant stated they circled a church off the rural road on the way to the scene of the stabbing. Although the physical evidence does not show the victim was struck by the wheels of the car, Defendant's statement that he drove the car over her body because she was still alive, and presumably to ensure her death, especially indicates a callous disregard for life. Evidence that he felt remorse was sharply contradicted.

 It is also insisted that T.C.A. § 39–2–203(i)(5) is unconstitutionally vague under the holding in *Maynard v. Cartwright,* —— U.S. ——, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), that the language "especially heinous, atrocious, or cruel" is insufficiently narrow to support a capital sentence. Subsection (i)(5) requires, in addition, a finding of "torture or depravity of mind," and is further narrowed by the definitions adopted in *State v. Williams,* 690 S.W.2d 517 (Tenn.1985). As we held in that case, the additional instructions give the jury sufficient guidance to prevent arbitrary sentencing.

 Defendant lists a number of issues we are unable to address because they are presented without argument. Some have no obvious merit.[6] Others have been decided adversely to defendant's position. In brief, the Tennessee capital sentencing procedure is not unconstitutional and the State is properly permitted final argument, *State v. Melson,* 638 S.W.2d 342 (Tenn. 1982); and a jury qualified on capital sentencing issues is not incompetent to determine the guilt or innocence of the accused, *State v. McKay,* 680 S.W.2d 447 (Tenn. 1984).

---

6. Erroneous instructions on lesser degrees of homicide; no allowance of new voir dire before sentencing; refusal to permit the jury to view capital sentencing facilities; racial disparities in the imposition of the death penalty, a higher proportion of black men given death for killing white women than white men who kill black or white women or black men who kill black women. Defendant has presented no statistical evidence to support these last assertions. *See McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *State v. Porterfield,* 746 S.W.2d 441, 451 (Tenn.1988).

After review mandated by T.C. A. § 39–2–205, we find: that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports the jury's findings of three statutory aggravating circumstances; and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found. Our comparative proportionality review of first degree murder cases convinces us that the sentence of death by the jury was neither arbitrary nor excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The sentence of death will be carried out as provided by law on the 31st day of May, 1989, unless stayed or otherwise ordered by this Court or by other proper authority. Costs are adjudged against the defendant.

FONES, COOPER, HARBISON and O'BRIEN, JJ., concur.