IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2005

## TERRANCE B. SMITH v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Tipton County**
**No. 3593     Joseph H. Walker, Judge**

---

**No. W2004-02366-CCA-R3-PC  - Filed October 7, 2005**

---

The Appellant, Terrance B. Smith, appeals the denial of his petition for post-conviction relief by the Tipton County Circuit Court.  In 1998, Smith was convicted by a jury of first degree murder and sentenced to life in prison.  On appeal, he argues that he was denied the effective assistance of counsel based upon:  (1) trial counsel's conflicts in representing different interests at trial and (2) the denial of his fundamental right to testify.  After review of the record, Smith's claim of conflicts of interest is without merit; however, we conclude that Smith was denied his right to testify at trial. Nonetheless, after review, we find the error harmless.  Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

Jeffery L. Stimpson, Munford, Tennessee, for the Appellant, Terrance B. Smith.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and James Walter Freeland, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### Factual Background

The facts of the case, as developed at trial, establish:

The victim and defendants were apparently friends.  On April 12, 1998, they arrived at and departed from the Smith/Edwards party together in the victim's car. Defendant Smith was wearing a red Tommy Hilfiger shirt and a white cap.  Within

fifteen minutes of their last departure, the party's hosts received news of the victim's murder.

At approximately 7:00 p.m., Ms. Michelle Johnson witnessed defendants and the victim standing alongside the victim's green Chevrolet automobile at the intersection of Simonton and Wortham in Tipton County. Uncharacteristically, the victim did not acknowledge her greeting at that time. Upon her return to the intersection just minutes later, she pulled up behind the victim's car where she saw defendants sitting in the car, but did not see the victim. She sped away when defendant Price [sic] frightened her by running back to her car, banging on the passenger-side window and trying to open the locked door.

While speaking with her mother in a driveway near the intersection of Wortham, Ms. Lane Howard heard several loud gunshots and heard a man scream. When she went around to the driver-side of her minivan, she saw the back of a man holding a gun in his right hand. The man stood near the tree line and wore a red, short-sleeved shirt. At trial, Howard identified the shirt worn by Smith the evening of the shooting as similar to that worn by the man she witnessed in the field. Howard also thought the man she saw wore a white cap. As she and her mother ran inside the house, Ms. Howard heard another round of shots, but did not see who fired them.

Police responded to the scene of the shooting in less than ten minutes. They found the victim's body in the field near the tree line adjacent to the south side of Wortham. Police also discovered multiple bullet casings, both in the road and near the victim's body. Investigator Ricky Chandler noted that the casings found in the road had different markings than those found near the body. Based upon his experience with firearms, this indicated to him that bullets were fired from two different guns.

Later that night, officers arrested defendants almost twenty-three miles away at Lawrence Taylor's home. When police surrounded Taylor's home and ordered the defendants to give themselves up, defendant Price [sic] came out of the house almost immediately; Smith refused. It took law enforcement nearly an hour more to extricate defendant Smith from the house using chemical agents. Ultimately, they found Smith in a back bedroom under the bed covers wearing a red shirt.

After the defendants' arrest and during a gunshot residue test conducted by Investigator Chandler, defendant Pride stated, "I shot him, but I didn't kill him."

Approximately one month after the homicides, with the assistance of Lawrence Taylor's nephew, investigators found the 9-millimeter FEG and the 9-millimeter P-38 pistols involved in the shootings. Steve Scott, a forensic scientist with the Tennessee Bureau of Investigation, conducted ballistics tests using the

recovered guns, two bullets recovered from the body of the victim, and shell casings collected by Investigator Chandler from the field and the street.

Agent Scott's tests revealed that one shell casing definitely was fired from the FEG pistol, the other definitely from the P-38. The bullet recovered from the victim's left shoulder area definitely was fired from the FEG pistol; the bullet recovered from the abdominal area could have been fired from either the FEG or the P-38.

At trial, defendant Pride testified that defendant Smith initiated the startling chain of events when he ordered the victim into the trunk of the car. A scuffle ensued between the victim and defendant Smith in the front seat of the car. When a gun appeared in defendant Smith's hand, the victim and defendant Pride exited the driver-side of the vehicle.

According to defendant Pride's testimony, defendant Smith came around to the victim's side of the car and verbally continued the altercation. When the victim ran away toward the field and tree line south of Wortham, defendant Smith fired several shots in his direction. The shots missed, and defendant Smith dropped the gun to the ground.

Defendant Pride further testified that, immediately after defendant Smith dropped the gun, he picked it up and continued firing at the fleeing victim. Asked why he did this, defendant Pride stated, "because I was scared he was going to get away and tell somebody . . . that we tried to lock him in the trunk." He admitted that one shot hit the victim in the pelvic area and a second shot hit the victim in the arm, causing him to fall over into the tree line.

Defendant Pride testified he then got in the driver's seat of the victim's car and discovered the keys were not in the ignition. In response to his comment, "Man, the keys gone (sic)," defendant Pride claims that a third passenger, the juvenile Robert Pride, jumped out of the car and went to where the victim lay screaming in the field. Defendant Pride claims that Robert Pride had the second gun and fired several more shots. According to defendant Pride, the screaming stopped and Robert returned with the car keys.

Robert Pride testified at trial and admitted riding around with defendants and the victim in the hours leading up to the shooting. However, he denied any involvement in the shooting and claimed to have gotten out of the car before they reached the intersection of Simonton and Wortham. Robert testified that when defendants picked him up about an hour later in the victim's car, the victim was no longer with them and there was a gun in the car. According to Robert, he did not ask, and defendants said nothing, about the victim's whereabouts.

The victim died as a result of multiple gunshot wounds from two different guns. The medical examiner testified that he found eight entrance wounds and six exit wounds on the victim's body and that six of the eight would have been fatal in and of themselves. . . .

Defendant Smith did not testify at trial.

Based upon the evidence, the jury convicted both defendants of premeditated first degree murder.

*State v. Michael D. Pride and Terrance B. Smith*, No. 02C01-9901-CC-00032 (Tenn. Crim. App. at Jackson, Nov. 29, 1999). Pride and the Appellant were later sentenced to life imprisonment. *Id*. The convictions were affirmed by a panel of this court on direct appeal. *Id*.

In August 2000, the Appellant filed a *pro se* petition for post-conviction relief, alleging numerous claims of ineffective assistance of counsel in addition to judicial misconduct. Counsel was appointed in December 2000, but the Appellant, proceeding *pro se,* filed an amended petition in October 2003. The second petition also alleged multiple grounds for ineffective assistance of counsel and trial court error, as well as prosecutorial misconduct. A hearing was held on September 15, 2004, at which only the Appellant testified. The Appellant stated that after his trial he became aware that trial counsel, as an assistant public defender, had previously represented two of the State's witnesses in other criminal matters. Additionally, the Appellant testified that he told trial counsel he wanted to testify in his own defense, but trial counsel rested the case without allowing the Appellant to take the stand. After hearing the evidence presented, the post-conviction court denied relief by written order of September 16, 2004. This appeal followed.

**Analysis**

On appeal, the Appellant asserts that trial counsel was ineffective in denying the Appellant his right to "conflict free counsel" and that counsel denied him his fundamental right to testify at trial. In addition, in his reply brief, the Appellant urges us to consider additional grounds supporting his claim of ineffective assistance of counsel. His entire argument with regard to these additional allegations is as follows:

In reference to ineffective assistance of counsel, Appellant specifies that the errors omitted from the original brief concerning: 1) the failure to object by counsel; 2) severance; and 3) jurors notes and others in the Amended Petition have not been waived and that these errors as specifically ruled on by the trial court together with those enumerated in Appellant's brief are relied upon by the Appellant and Appellant reiterates that there is evidence in the record which preponderates against the post-conviction court's findings and conclusions of law.

Despite his additional assertions of ineffectiveness, the Appellant's reply brief fails to make appropriate reference to the record and contains no authority or arguments in support of the Appellant's position. Rule 27 of the Tennessee Rules of Appellate Procedure provides in relevant part that:

> The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on [.]

Tenn. R. App. P. 27(a)(7). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, the Appellant has waived consideration of the additional grounds of ineffectiveness enumerated in his reply brief. Thus, we review the issue of ineffective assistance of counsel considering only the Appellant's assertions regarding the denial of his right to "conflict free counsel" and his right to testify.

To succeed on a challenge of ineffective assistance of counsel, the Appellant bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). The Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, (1984), the Appellant must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependant upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, *conclusions of law* are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

## I. Conflict Free Counsel

The Appellant testified at the post-conviction hearing that, prior to his trial, trial counsel represented Frances Smith and Robert Pride in his capacity as an assistant public defender. Both Smith and Pride testified as prosecution witnesses in this case,[1] and the Appellant asserts that trial counsel's former representation of these key State witnesses created a conflict of interest in counsel's representation of him at trial.

It is unquestioned that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." *State v. Thompson*, 768 S.W.2d 239, 245 (Tenn. 1989). An actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interest and exists "where an attorney is placed in a position of divided loyalties." *Kevin Burns v. State*, No. W2000-02871-CCA-R9-PD (Tenn. Crim. App. at Jackson, Aug. 9, 2001) (citing *State v. Tate*, 925 S.W.2d 548, 553 (Tenn. Crim. App. 1995)). A conflict "may exist anytime a lawyer cannot exercise his or her independent professional judgment free of 'compromising influences and loyalties.'" *State v. Culbreath*, 30 S.W.3d 309, 315 (Tenn. 2000) (citing *Tate*, 925 S.W.2d at 554).

A panel of this court has noted that:

> The right to counsel requires complete devotion to the interest of the defendant. *State v. Knight*, 770 S.W.2d 771 (Tenn. Crim. App. 1988). When counsel is unable to provide a "zealous representation . . . unfettered by conflicting interest," there has been a breach of the right to the effective assistance of counsel. *State v. Thompson*, 768 S.W.2d 239 (Tenn. 1989). In *Cuyler v. Sullivan*, the United States Supreme Court held that because there is a breach of loyalty in cases involving a conflict of interest, prejudice is presumed. 446 U.S. 335, 100 S. Ct. 1708 (1980). Unless the petitioner can establish that his counsel "actively represented conflicting interests," he can not established [sic] the constitutional predicate for his claim. *Id*. at 350. To establish a claim based upon conflict of interests, the conflict must be actual and significant, not irrelevant or "merely hypothetical." *Howard Clifton Kirby v. State*, 1994 Tenn. Crim. App. LEXIS 625, No. 03C01-9303-CR-00074 (Tenn. Crim. App. at Knoxville, Sept. 28, 1994).

*Jesse Jameel Dawan v. State*, No. W2001-00792-CCA-R3-CD (Tenn. Crim. App. at Jackson, Mar. 11, 2002). Generally, prejudice will only be presumed when the conflict of interest arises in cases involving representation of serial or co-defendants. *Anthony Darrell Hines v. State*, No. M2002-01352-CCA-R3-PD (Tenn. Crim. App. at Nashville, Jan. 23, 2004).

---

[1] We note that there is no proof in the record that trial counsel previously represented Frances Smith or Robert Pride. The transcript of the post-conviction hearing reflects that counsel moved for the introduction of certified copies of court records reflecting a prior representation; however, no such exhibits were ever introduced. Nonetheless, we elect review.

The post-conviction court denied relief, specifically finding that "[the Appellant] did not show how the prior representation of witnesses caused prejudice to [the Appellant] at this trial. There was no conflict shown, or that services rendered to [the Appellant] were somehow deficient because his attorney had represented witnesses in other matters which were long concluded." We agree.

The record before us does not establish that an actual conflict existed. Even if we presume that trial counsel did represent the two witnesses on previous occasions, there is no proof that those representations had any effect upon his representation of the Appellant. Trial counsel's prior representations of the two witnesses were totally unrelated to the instant case. Nothing in the record establishes any form of a continuing relationship between either of the two witnesses and trial counsel. There was no proof presented that shared confidences were violated due to the representation. Thus, we agree with the post-conviction court that neither deficient performance or prejudice was established. This issue is without merit.

## II.  Right to Testify

At the post-conviction hearing, the Appellant testified that trial counsel did not adequately inform him of his right to testify in his own defense. Trial counsel did not testify at the post-conviction hearing. Moreover, after the close of the State's proof, the Appellant states he informed trial counsel that he wanted to testify, but trial counsel rested the case without allowing the Appellant to take the stand.

In *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), our supreme court recognized that "the right of a criminal defendant to testify in his or her own behalf is a fundamental constitutional right." *Id*. at 161. Accordingly, "the right may only be waived personally by the defendant." *Id*. Because the right to testify is both fundamental and personal, it "may only be waived if there is evidence in the record demonstrating 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id*. at 162 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)). Thus, "[t]he waiver of a fundamental right will not be presumed from a silent record, and the courts should indulge every reasonable presumption against the waiver of a fundamental right." *Id*. (citations omitted).

However, the procedures adopted by the Tennessee Supreme Court in *Momon* to ensure that a defendant has personally waived his right to testify have no application to this case, as the Appellant's trial was concluded prior to the decision in *Momon*.[2]  Moreover, the court in *Momon* expressly held that the procedures set forth did not establish a new constitutional rule which must be retroactively applied, specifying that the procedures should be applied in all cases tried or retried after the date of the decision. *Id*. at 162-63. Nonetheless, if the Appellant was actually denied his right to testify by his trial counsel, there is still constitutional error. *Id*. Thus, while the

---

[2]The trial in this case concluded on December 16, 1998; *Momon* was filed November 15, 1999.

'prophylactic' procedures set forth in *Momon* are not mandatory in the present case, we nonetheless refer to the principles expressed in the case as guidelines.

We conclude from the record before us that the Appellant did not personally waive his right to testify at trial, and, thus, his fundamental constitutional right to testify was violated. Accordingly, we conclude that trial counsel's failure to adequately inform the Appellant of his right to testify at trial constituted deficient performance. However, this does not end our inquiry.

The supreme court has concluded that a violation of this nature is subject to harmless error analysis because the "error involves the exclusion of testimony which is evidence that can be 'quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" *Id*. at 166 (citations omitted). Once it has been established that the Appellant did not personally waive this fundamental constitutional right, the burden shifts to the State to establish that the denial of the right to testify was harmless beyond a reasonable doubt. *Id*. at 167. The court provided instructive, nonexclusive factors which assist a court in determining whether an error in denying a defendant his right to testify is harmless beyond a reasonable doubt:

> (1) the importance of the defendant's testimony to the defense case;
>
> (2) the cumulative nature of the testimony;
>
> (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and
>
> (4) the overall strength of the prosecution's case.

*Id*. at 168. It emphasized that "the goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict." *Id*. (citations omitted).

At the hearing, the Appellant recited the testimony he would have given had he been allowed to testify.

> Earlier in the day, about, it was around the early afternoon hours, Mr. Thompson, Mr. Michael Pride, Robert Pride, and I, we got together, and we went out to Ms. Frances Smith's house for an Easter egg hunt. . . .
>
> Then around approximately seven o'clock, we left and went over to Ms. Cleaves' house. And after that right there, we stayed over her house for about approximately ten to 15 minutes. Then all four of us, Mr. Pride, Robert Pride, Michael Pride, the victim, Raymond Thompson, and I, we left there, and we was driving, and we headed - - we drove off on the intersection of Wortham and Simonton, you know what I'm saying.

. . . We was listening to the rap music. Every now and then, you know what I'm saying, I was bouncing around and was singing aloud with the song.

I think the words that I said to the song, Mr. Thompson must have thought I was talking to him, because he took offense to the words, you know what I'm saying. Then we got to arguing, and a struggle ensued. He reached up under his seat, pulling up a weapon, and we wrestled over the weapon. And I head butted him, dazing him a little bit, and I retrieved control of the weapon. By that time, after when I retrieved control of the weapon, Mr. Thompson, he grabbed the keys and he ran out. He opened the driver's side of the door. He ran out the vehicle. And I opened my passenger's side of the door, and I chased behind him.

At that point I fired two shots at Mr. Thompson, but neither one of those striking the victim. At that time there I panicked, I dropped the gun, and I headed back to the . . . passenger's side of the car.

At that point my codefendant Michael Pride, he was already out the car. He picked up the weapon that I had dropped. He fired it approximately two to three times at Mr. Thompson. During that time, two of the bullets struck him, I think in the lower back and the pelvis area, something to that extent. Mr. Thompson, he went over there. He fell in the tree line towards the intersection, and he fell toward - - he fell in the tree line.

And at that point Mr. Michael Pride, he ran back to the car, was fixing to get ready to take off in the vehicle, but he noted that the keys wasn't in the car. And at that point, that's when Mr. Robert Pride, he volunteered to go get the keys. But at the time he went in the field to retrieve the keys, we didn't know what he was going to do at the time. His whole intention was going in there to shoot the victim, to shoot the victim, and that's what he did.

After he shot the victim, he came back to the car, you know what I'm saying, and Michael Pride asked him where the keys was. He didn't understand, you know what I'm saying. He said, "What keys?" you know what I'm saying. He didn't get the keys.

At that point, that's when Michael Pride, he got out the car, he went out there, and he retrieved the keys from the victim. As he was leaving, exiting the tree line area, that's when Ms. Michelle, the State witness, Michelle Johnson, she came up. She saw him exiting the tree area. That's when he went up to her, I guess to try to explain what went on and tried to want to tell somebody what just occurred. He was beating on her window profusely, and at that point she pulled off because I guess she was scared or whatever. She pulled off at a high rate of speed.

That's when Michael Pride, he jumped into the car, crunk up the car, and he drove on behind her at a high rate of speed, not actually chasing her, but he was trying to get away. He was gong to the Towering Heights area where we were found, where we were apprehended at.

The Appellant further testified that he believed that if he had testified, the verdict would have been affected because the jury would have been able to assess his credibility.

In its order, the post-conviction court denied relief, explicitly stating "that the verdict would not have been different if the [Appellant] had testified at trial. [The Appellant] testified he fired shots at the victim. The expert testimony at trial established that the victim was struck by bullets from two different guns. [The Appellant] testified that he knew of only two guns at the scene. [The Appellant] fired one of those guns."

First, with regard to the importance of the testimony factor, we find that the Appellant's proffered testimony would have been of no legal significance to his defense. The Appellant admitted he was at the scene of the crime, that he had an altercation with the victim, and that he fired several shots at the victim as the victim attempted to flee. However, none of the bullets from his weapon struck the victim. This was confirmed by the testimony of Michael Pride. Nonetheless, under our criminal code, a person is criminally responsible for an offense committed by the conduct of another who is aiding or assisting in the commission of the offense. Tenn. Code Ann. § 39-11-402(2) (2003). As such, it is immaterial whether the criminal defendant's own conduct, the conduct of another for which he is criminally responsible, or the conduct of both in combination, establish the elements of the crime charged. Tenn. Code Ann. § 39-11-401(a) (2003). This court's recitation of facts on direct appeal states: "The medical examiner testified that the bullet that pierced the victim's arm and went into his chest would have been fatal. Defendant [Michael] Pride testified that he inflicted a wound to the victim's arm." *State v. Michael Smith and Terrance B. Smith*, No. 02C01-9901-CC-00032. Thus, under the theory of criminal responsibility, which was charged to the jury, the Appellant's own testimony establishes his culpability for the homicide. *See* Tenn. Code Ann. § 39-11-402.

Second, the Appellant's testimony would have been cumulative, as Michael Pride presented virtually the same testimony at trial. Indeed, the Appellant admitted at the post-conviction hearing that Pride's testimony "[b]asically . . . would have been almost the same thing. . . ." Thus, there was corroborating evidence of the Appellant's testimony at his trial. Additionally, multiple witnesses placed the Appellant at the scene of the shooting, and ballistics testing confirmed the use of two weapons in the homicide. Although Robert Pride denied any involvement in the shooting of the victim, Michael Pride testified that Robert was present and fired fatal shots. Moreover, the overall strength of the prosecution's case was significant. Thus, after review, we conclude that the error in failing to protect the Appellant's right to testify was harmless beyond a reasonable doubt. The harmless nature of the error results in the conclusion that the Appellant has failed to prove by clear and convincing evidence that he suffered prejudice necessary to establish ineffective assistance of counsel. *See Demetrius K. Holmes v. State*, No. E2003-02306-CCA-R3-PC (Tenn. Crim. App. at

Knoxville, Oct. 7, 2004). As such, we hold that the record fails to establish ineffective assistance of counsel with regard to this issue.

## CONCLUSION

Based upon the foregoing, the Tipton County Circuit Court's denial of the Appellant's petition for post-conviction relief is affirmed.

_____
DAVID G. HAYES, JUDGE