IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 7, 2001 Session

## STATE OF TENNESSEE v. RAIN THOMAS CHESHER

**Appeal from the Circuit Court for Henry County**
**No. 12936     Julian P. Guinn, Judge**

---

**No. W2000-01701-CCA-R3-CD  - Filed May 14, 2001**

---

A jury convicted the Defendant of first degree premeditated murder, and he was sentenced to life imprisonment.  In this direct appeal, the Defendant contends that he received ineffective assistance of counsel at trial and challenges the sufficiency of the evidence.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and NORMA MCGEE OGLE, J., joined.

Donald E. Parish, Huntingdon, Tennessee, for the appellant, Rain Thomas Chesher.

Paul G. Summers, Attorney General and Reporter; Glen C. Watson, Assistant Attorney General; Robert Radford, District Attorney General; and Steve Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant, Rain Thomas Chesher, was indicted for first degree premeditated murder in connection with the stabbing death of his girlfriend, Cheryl Fain.  A jury convicted the Defendant as charged, and he was sentenced to life imprisonment.  In this direct appeal, the Defendant contends that he received ineffective assistance of counsel at trial because his lawyer failed to fully disclose a potential conflict of interest and because he did not object to the admission of the recording of a 911 phone call.  He also challenges the sufficiency of the evidence.  While we agree with the Defendant that his lawyer should have objected to the admission of the 911 call, we find that this error did not so prejudice the Defendant as to entitle him to a new trial.  We find no error with respect to the alleged conflict of interest.  We further find the evidence sufficient to sustain the Defendant's conviction.  Accordingly, we affirm the judgment of the trial court.

Joe Lamb[1] was the Defendant's uncle, and he lived in the basement of the Defendant's mother's house. Lamb had known the victim for one and a half to two years and described her relationship with the Defendant as "off and on a boyfriend and girlfriend relationship." On the June 1999 night in question, Lamb had gone to bed sometime before ten o'clock. The Defendant and his friend Jimmy Dion Burr were in the house when Lamb went to bed; the victim was not. Lamb got up at about midnight and went upstairs to turn the stereo off; while he was in the living room, he noticed the Defendant and the victim sitting at the kitchen table. It appeared as though the Defendant was giving the victim a tattoo. Lamb also noticed Burr lying down on the couch in the living room. Lamb did not speak to anyone, nor anyone to him, and he returned to the basement after turning off the stereo.

At about three a.m., Lamb heard the Defendant stomping on the floor above him and hollering for him to come upstairs. Lamb went up and found the Defendant "in a pretty disoriented state." The victim was lying on the floor in front of the couch; the Defendant was holding a plastic bag over a wound in her chest. Lamb testified that there was blood all over the carpet and all over the victim. The Defendant told Lamb, "she's dead," or "she's dying," or "I killed her." Lamb could not remember which of the three statements the Defendant actually made because he was "pretty shook up." The Defendant asked Lamb, "What can I do?" and Lamb told him to call 911. The Defendant told Lamb that he could not do that, so Lamb stated that he would. The Defendant told Lamb not to call 911. Lamb called the Defendant's mother and told her to come home immediately. Lamb then told the Defendant that he was going to call 911. When Lamb picked up the phone, the Defendant left, taking a small suitcase with him. Lamb took over holding the plastic bag to the victim's chest. While Lamb was on the phone with the 911 dispatcher and waiting for the police to arrive, Burr came in. Burr told Lamb that he had been outside hiding. Lamb testified that Burr "wasn't bloody or anything like that."

After the police and paramedics arrived, Lamb went into the bathroom and saw a pair of shorts on the floor with a knife lying on them. He recognized the knife as one he had given to the Defendant. He testified that he thought the shorts were the Defendant's because he thought that was what the Defendant had been wearing when he went to bed.

The recording of Lamb's call to the 911 dispatcher was admitted into evidence and played for the jury with no objection from defense counsel. The phone call lasted for several minutes because the dispatcher wanted Lamb to stay on the line until the police arrived. The phone call begins with Lamb telling the dispatcher, "there's been a stabbing 405 North Brewer Street, you need to send an ambulance and a squad car." Lamb identified the victim as his nephew's girlfriend and explained that she was still alive but had been stabbed in the chest. When the dispatcher asked if the perpetrator was still there, Lamb responded, "[t]he guy that did the stabbing run [sic]," and identified him as the Defendant, "Rain Chesher." Lamb also offered a physical description and stated that the Defendant would "probably be driving an old yellow Toyota Celica," adding that the

_____

[1]Lamb died prior to the Defendant's trial. His preliminary hearing testimony was read to the jury and into the trial record.

Defendant had been gone about ten minutes. In response to further questions from the dispatcher, Lamb again stated the Defendant's name, spelling it, as the person who had stabbed the victim.

Gregory Alan Underwood, an officer with the Paris Police Department, testified that he arrived on the scene and saw Lamb and Burr in the living room. He explained that Burr was cooperative and never gave him cause to suspect that he was involved with the stabbing.

Brian Charles Byrd, an agent with the Tennessee Bureau of Investigation (TBI), testified that he investigated the scene and took photographs. One of the photographs depicts the couch in the living room with large bloodstains. Another depicts the pants in the bathroom, also bearing bloodstains. Byrd found in these pants a wallet containing the Defendant's Tennessee driver's license. Byrd never developed any suspicions about Burr.

Joseph Payne Minor, a TBI forensic scientist, testified that the blood found on the knife blade matched the blood on the couch and the blood on the pants found in the bathroom. This blood was from a human female.

Officer Dennis Earl French went to the Defendant's residence at about five o'clock that morning but did not find the Defendant home. French stayed and watched the house for approximately one and a half hours, at which point the Defendant came out of the woods wearing a camouflage coat, face paint and a ball cap. After the Defendant was taken into custody, Officer Jaque Bass interviewed him. According to Officer Bass, the Defendant kept repeating that he wanted something to eat and wanted a blood test. Officer Bass testified that the Defendant "appeared arrogant."

Pamela Sue Hudgins, the victim's oldest sister, testified that the Defendant had called her in February 1999 and told her that he wanted her to decorate and deliver a cake to the victim. The Defendant wanted the cake to look like a broken heart with the words "you will reap what you sow" or "what comes around goes around" written on it. The Defendant also requested Hudgins to decorate the cake with black roses. When Hudgins responded that black roses meant death, the Defendant "laughed." Hudgins testified that she refused to make the cake, but did not warn her sister or tell the police about the Defendant's request.

Jimmy Dion Burr testified that he had known the Defendant for fifteen years. He had met the victim about four or five months prior to her death. Burr testified that the victim had arrived at the Defendant's mother's house at about ten-thirty or eleven o'clock that night. He and the Defendant had been drinking beer all day; after the victim arrived, they went to a bar and drank some more. The threesome stayed at the bar until about midnight and then walked back to the house. Burr testified that the Defendant was "holding his own" with the alcohol.

When they got back to the house, the Defendant got out his tattoo equipment and started working on a tattoo on the victim in the kitchen. Burr went into the living room and laid down on the couch. The Defendant came in and told him to get up so they could go get some more beer. Burr

declined, so the Defendant and the victim left and were gone twenty to twenty-five minutes. After they returned, the Defendant went to Burr, tapped him on the shoulder, and told him "to leave now or die." Burr became frightened and left; he went outside and knelt beside Lamb's truck in front of the house. The Defendant subsequently came outside and hollered for Burr; Burr remained silent and hidden. The Defendant went back into the house and then returned outside a few minutes later. He again hollered for Burr, and Burr stood up. Burr asked the Defendant what was going on and if the Defendant still wanted to kill him. The Defendant responded that he just wanted to talk. The Defendant then told Burr that Burr had two choices: he could "be an accomplice or a victim." Burr told the Defendant he wanted nothing to do with it; it was crazy. The Defendant then tapped Burr on the cheek, smiled, and said, "You know what to do." The Defendant then returned to the house.

Burr remained outdoors and went to the side of the house, looking into one of the living room windows. He heard the victim say, "Don't Rain, that hurts. Oh, please, I've got children." Burr testified that when he heard the victim say that, he "knew what [the Defendant] was doing" and became convinced his own life was in danger. He went down the street and crossed it, hiding near an abandoned house in some tall weeds. About twenty minutes later, he testified, he saw the Defendant come out the front door with a suitcase, get in his car, and leave.

On cross-examination, Burr admitted that he was in jail for hitting his ex-girlfriend.

Dr. O'Bryan Clary Smith performed the autopsy on the victim. He testified that she died from a stab wound to the chest that punctured her heart and one of her lungs. He also observed bruises to the sides and the back of the victim's head, a skin scrape on the right side of her neck, tears in her lips, and bruises to her tongue. Smith testified that these injuries were consistent with an attempted strangling or multiple blows with a fist.

The Defendant testified, claiming that he remembered nothing about how the victim had been stabbed. He stated that he had been "drinking beer, eating Valiums and smoking crack" that day, and he had no recollection about what had happened. He testified, "if I did something to her, which I don't -- I don't know if I did or not, but if I did it was totally unintentionally because I loved that woman." He admitted that the knife was his, but he did not know if the pants were. He stated the cake incident occurred in 1998 and claimed that it was inspired by the Rolling Stones song, "Dead Flowers." He explained that the victim mentally abused him and had broken up with him again, causing him to want to "send her something dirty."

Psychologist John W. McCoy evaluated the Defendant prior to trial. McCoy testified that the Defendant initially told him that all he knew about the murder was that, when he came out of the woods, the police were at his house and arrested him. He did not know why he had been arrested until his mother told him later about the stabbing. The Defendant told McCoy, "They are alleging that I killed her, that's all I know." He told McCoy that the last thing he remembered about that night was giving the victim a tattoo and getting green tattoo ink on his face. The Defendant also told McCoy "that he believed that all of [his prior] legal trouble and the current legal trouble that he was

in was caused by alcohol and drugs." Following his evaluation, McCoy made "no diagnosis of any mental condition."

On rebuttal, Michael John Little, a TBI forensic scientist, testified that he analyzed a blood sample drawn from the Defendant at nine-twenty on the morning of the murder. He found no traces of cocaine but found Valium within the therapeutic range. John W. Harrison, a TBI toxicologist, analyzed the blood for alcohol content and determined the level to be .07 gram percent. He stated that this level indicated a level of approximately .15 gram percent about five hours earlier. He also testified that the presumptive level of intoxication was .10 gram percent.

### INEFFECTIVE ASSISTANCE OF COUNSEL

The Defendant contends that his trial counsel committed errors during his representation that were so grave and prejudicial as to entitle him to a new trial. Specifically, he contends that his trial lawyer should have declined his case because the lawyer had earlier represented the victim in a child support matter not involving the Defendant. He also contends that his trial lawyer should have objected to the introduction of the 911 tape as inadmissible hearsay[2] and that his lawyer's failure to do so renders the jury's verdict unreliable. Upon our review of the record and relevant legal authority, we respectfully disagree with the Defendant and find that he is not entitled to a new trial on the basis of ineffective assistance of counsel.

Both the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution guarantee a defendant the right to representation by counsel. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to counsel includes the right to effective counsel. See id.; Strickland v. Washington, 466 U.S. 668, 686 (1984).

To determine whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936; Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). To succeed on a claim that his or her counsel was ineffective at trial, a defendant bears the burden of showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the defendant resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687; Burns, 6 S.W.3d at 461; Hicks, 983 S.W.2d at 245. To satisfy the second prong, the defendant must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the defendant's guilt. See Strickland, 466 U.S. at 694-95. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994); Owens v. State, 13 S.W.3d 742, 750 (Tenn. Crim. App. 1999).

---

[2]"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay statements are generally inadmissible. See Tenn. R. Evid. 802.

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Owens, 13 S.W.3d at 749. Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. See Strickland, 466 U.S. at 690; Hicks, 983 S.W.2d at 246.

Claims of ineffective assistance of counsel are raised most frequently in petitions for post-conviction relief. Although such claims are cognizable on direct appeal, "raising the issue of ineffective assistance on direct appeal is a 'practice fraught with peril.'" Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997) (citation omitted). This is because the defendant runs the risk of having the issue decided without the benefit of an evidentiary hearing, which might be the only way to demonstrate prejudice. Id. at 162. Under the current Post-Conviction Act, a defendant must prove his claim of ineffective assistance of counsel by "clear and convincing" evidence. See Tenn. Code Ann. § 40-30-210(f). Our Supreme Court has held that this same standard applies when the claim is brought on direct appeal. See State v. Burns, 6 S.W.3d 453, 461 n.5 (Tenn. 1999).

With respect to the Defendant's claim that his attorney had a conflict of interest sufficient to render his representation ineffective, we acknowledge that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." State v. Thompson, 768 S.W.2d 239, 245 (Tenn. 1989). Also, "[t]o establish a denial of the sixth amendment right to counsel, it is sufficient to show that an actual conflict existed. If an attorney actively represents conflicting interests, no analysis of prejudice is necessary; it is presumed that his divided interests adversely affected his representation." Id. (citation omitted). Here, however, there was no active representation of conflicting interests. The record contains an affidavit from the Defendant's lawyer which states that he represented the victim in "case number 96-CR-00051 in Calloway County Circuit Court as to the charge of Flagrant Nonsupport." The case number indicates that this charge was brought in 1996, several years prior to counsel accepting the Defendant's representation. There is no proof in the record which indicates that the charge against the victim in any way involved the Defendant. The Defendant asserts in his brief that "the duty of confidentiality owed to Ms. Fain by [the Defendant's lawyer] created a conflict of interest which should have resulted in [the Defendant's lawyer] declining to represent [the Defendant]." The Defendant's brief indicates that his lawyer should not have accepted his case because it "might [have] require[d] the disclosure of confidential information obtained in the course of representing [the victim]." We are puzzled by this argument. The Defendant cites no confidential information gleaned during the course of the Fain matter which defense counsel could or should have revealed to him in order to represent him, nor can we find any in the record before us. The prior representation was disclosed to the Defendant in a timely manner. No active conflict of interest existed that we can discern from the record. The Defendant having failed to prove by clear and convincing evidence that his lawyer was ineffective as a result of a conflict of interest, we find this issue to be without merit.

However, we agree with the Defendant that his lawyer's failure to object to the admission of the 911 tape was deficient. The tape was certainly prejudicial because, during his conversation with the dispatcher, Lamb identifies the Defendant as the perpetrator. Although other testimony

made clear that Lamb did not witness the stabbing and therefore must have been making an assumption, the evidence was nonetheless damaging to the Defendant's case. Absent some tactical reason to the contrary, defense counsel should attempt to exclude as much of the State's evidence against his or her client as legally possible. Here, defense counsel failed to make the necessary attempt, satisfying the first prong necessary to prove ineffective assistance of counsel under Strickland.

The State argues that, even had the Defendant objected to the 911 tape at trial on the basis that it was hearsay, the evidence was still admissible under the "excited utterance" exception to the hearsay rule. See Tenn. R. Evid. 803(2). Accordingly, the State contends, defense counsel's failure to make an objection did not prejudice the Defendant, and the Defendant therefore fails to satisfy the second prong required for a successful claim of ineffective assistance of counsel. We must agree.

A statement which is otherwise inadmissible hearsay is admissible if it relates to a startling event or condition and was made while the declarant was under the stress of excitement caused by the event or condition. Tenn. R. Evid. 803(2). Thus, three requirements must be satisfied before a hearsay statement will qualify as an admissible excited utterance: first, there must be a startling event or condition; second, the statement must relate to the startling event or condition; and third, the declarant must still be under the stress of excitement from the event or condition when the statement is made. See State v. Carl McKissack, No. W1999-01136-CCA-R3-CD, 2000 WL 674591, at *4 (Tenn. Crim. App., Jackson, May 24, 2000). We have no doubt that a fatal stabbing qualifies as a startling event or condition. There is also no doubt that Lamb's statements to the 911 dispatcher related to the startling event or condition. The issue for our determination, then, is whether Lamb was still under the stress of excitement from the stabbing while he was talking to the 911 dispatcher. The requirement that the declarant still be under the stress or excitement caused by the event or condition is the one which "relates most directly to the underlying rationale for the [excited utterance] exception [to the hearsay rule]." State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). "The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993).

However,
> [t]he time interval is but one consideration in determining whether a statement was made under stress or excitement: "Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress."

Gordon, 952 S.W.2d at 820 (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 803(2).2 at 534 (3rd ed. 1995)).

The proof at trial established that Lamb called 911 only a short time after discovering the victim's condition. He made the call while holding a plastic bag to the victim's wound while she struggled to breathe. Lamb testified that when he saw the victim he was "pretty shook up." He also testified that he couldn't remember exactly what the Defendant had said to him about what had happened because "there was a lot going through my head at that time." Lamb testified that he was "upset" when Burr came in while he was still on the phone to the dispatcher.

The record contains an audiotape of the 911 call. This Court has listened to the tape and acknowledges that Lamb sounds neither hysterical nor highly agitated. However, this Court has no basis from which to draw conclusions regarding Lamb's state of mind simply from the tone of his voice. People react differently to times of high stress and excitement. Lamb's own testimony indicates that he was upset during the time he was on the phone with the dispatcher, and the circumstances in which he found himself certainly support that assertion. The nature and seriousness of the event were grave -- Lamb was trying to assist a dying woman. That Lamb suspected his own nephew of the crime added to the stressful circumstances facing him. The content of the 911 call -- the need for assistance to a fatally stabbed woman -- also indicates the presence of stress. Thus, the relevant circumstances surrounding the 911 call indicate that Lamb was speaking while under the stress of excitement caused by the stabbing.

It is the Defendant's burden to show, by clear and convincing evidence, that the tape was inadmissible. We find that the Defendant has failed to do so. Indeed, had defense counsel objected and the trial court ruled the tape admissible as an excited utterance, we would be reviewing the trial court's ruling for an abuse of discretion. See State v. McLeod, 937 S.W.2d 867, 872 (Tenn. 1996) (trial court's admission of hearsay reviewed for abuse of discretion). Under the circumstances surrounding the 911 call, we would have found no such abuse.

Accordingly, while we agree with the Defendant that his trial lawyer should have objected to the admission of the 911 audiotape, we hold that his failure to do so did not so prejudice the Defendant as to call into question the reliability of the jury's verdict. Moreover, as set forth below, we find that the evidence is sufficient to support the Defendant's conviction even without the 911 tape. The Defendant has therefore failed to prove that he received ineffective assistance of counsel at trial, and this issue is without merit.

SUFFICIENCY OF THE EVIDENCE

We turn now to the Defendant's claim that the evidence is insufficient to sustain his conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence

was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

A first degree premeditated murder is a killing done intentionally and with premeditation. See Tenn. Code Ann. § 39-13-202(a)(1). An intentional killing occurs when it is the defendant's "conscious objective or desire to engage in" the killing or to cause the death. Id. § 39-11-302(a). A premeditated killing occurs when "done after the exercise of reflection and judgment." Id. § 39-13-202(d). That is, "the intent to kill must have been formed prior to the act itself," although "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id.

> Before a jury may infer premeditation, the proof must include the following:
> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity;
>
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
>
> (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

State v. Schafer, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997) (citation omitted). In this case, all three of these evidentiary requirements have been met. That the Defendant planned to kill the victim is obvious from his statements to Burr that he "leave now or die" and that Burr could "be an accomplice or a victim." As to motive, the proof established that the Defendant had had an on-again off-again romantic relationship with the victim in which, he testified, she mentally abused him, "run

[sic] around with other men," and repeatedly broke up with him. The proof also established that the Defendant had made at least one prior effort to revenge himself on the victim by attempting to send her a threatening cake. One of the psychologists who evaluated the Defendant reported that the Defendant had stated to him that it was wrong to commit murder, "unless a person deserves it." We think this proof establishes the Defendant's motive of punishing the victim for romantically disappointing him. Finally, the proof established that the Defendant hit and/or strangled the victim, eventually killing her with his own knife by a single stab wound through her heart and one lung: evidence sufficient to allow a trier of fact to conclude that the killing was designed and intended.

Thus, the evidence was sufficient to prove that the Defendant formed the intent to kill the victim after some amount of reflection and judgment. The evidence was also sufficient to prove that it was the Defendant who actually stabbed the victim to death. Lamb testified that he found the victim on the floor covered with blood and the Defendant holding a plastic bag to her chest, asking Lamb what he should do. When Lamb told him to call 911, the Defendant refused and tried to stop Lamb from calling. When Lamb did call, the Defendant left the scene, taking a suitcase with him. The Defendant did not go home but hid in the woods. Blood found on the Defendant's knife matched the blood found on the couch and on the pants containing the Defendant's wallet. This blood was that of a human female.

Prior to his attack on the victim, the Defendant threatened Burr, telling him to either leave the house or die. The Defendant later asked Burr to assist him in committing a crime. Burr refused, but subsequently heard the victim state to the Defendant, "Don't Rain, that hurts. Oh, please, I've got children."

The criminal investigation revealed no other suspects in the stabbing. The Defendant himself testified that he did not know how the victim came to be stabbed. He admitted that sometimes he blacked out just from being "very mad." He testified that the victim had mentally abused him. He admitted that the murder weapon was his.

This proof was more than sufficient to prove that the Defendant intentionally and with premeditation stabbed the victim to death. The Defendant's issue regarding the sufficiency of the evidence is therefore without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

-10-