IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2016 Session

## DENNIS CEDRIC WOODARD, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 10392   Forrest Durard, Jr. Judge**

_____

**No. M2015-02002-CCA-R3-ECN – Filed November 8, 2016**
_____

The Petitioner, Dennis Cedric Woodard, Jr., appeals the Bedford County Circuit Court's denial of his petitions for post-conviction relief and for a writ of error coram nobis from his first degree premeditated murder conviction and his resulting life sentence. The Petitioner contends that the court erred by denying (1) post-conviction relief and (2) coram nobis relief. We affirm the judgments of the post-conviction and coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Andrew Love, Nashville, Tennessee, for the appellant, Dennis Cedric Woodard, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert J. Carter, District Attorney General; Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the shooting death of Scott Shafter. On the night of April 12, 2001, the Petitioner confronted and fatally shot the victim after a physical altercation between them occurred earlier that day. *See State v. Dennis Cedric Woodard, Jr.*, No. M2002-00122-CCA-R3-CD, 2003 WL 169082, at *1 (Tenn. Crim. App. Jan. 24, 2003), *perm. app. denied* (Tenn. May 12, 2003). The Petitioner appealed, and in its opinion affirming the conviction, this court summarized the facts as follows:

The proof offered by the State demonstrated that on the night of April 13, 2001, the homicide victim, Scott Shafer, was shot near Derry Street in Shelbyville. Earlier that day, at around four o'clock, the victim had been visiting the home of LaShawn Nunnally. Ms. Nunnally testified that sometime later the [Petitioner] arrived at her house carrying a gun. The [Petitioner] pointed the gun at the victim and said, "Nigga, are you real or are you fake?" The victim responded to the [Petitioner], who was commonly referred to as "Junior," by saying, "Junior, man, quit playing. I'm fucked up." The [Petitioner], still pointing the gun at the victim, then repeated his question. At that point, Ms. Nunnally requested that the two men leave the front of her house. The [Petitioner] and the victim went to the rear of the house, and Ms. Nunnally followed. She asked the [Petitioner] for the gun, and he gave it to her. Immediately thereafter, Jarmaine Hill, Ms. Nunnally's boyfriend, and Mike Jones arrived. Mr. Hill inquired what Ms. Nunnally was doing with the [Petitioner]'s gun. She responded that she was trying to "prevent trouble." Mr. Hill then demanded that she return the [Petitioner]'s gun, which she did, but she kept the clip that contained the bullets and went back around to the front porch of her house. A few minutes later, the four men came to the front of the house, and the [Petitioner]'s mouth was bleeding. When Ms. Nunnally asked what had happened, the victim replied, "I dunked him on his head." The [Petitioner] then said to the victim, "Man, you fucked up my grill." Then the [Petitioner] smiled at the victim and added, "You are going to remember this tonight." However, Ms. Nunnally testified that the [Petitioner] and the victim then hugged, made up, and left together in the victim's car. After all the men left, Ms. Nunnally wrapped the pistol clip in toilet paper and tossed it into a creek.

About two hours later, Ms. Nunnally had gone to another house to visit with friends. Jarmaine Hill and Mike Jones arrived; then a few minutes later, the [Petitioner] and the victim drove up. As the day got later, Ms. Nunnally, her two daughters, and the victim decided to walk back to Ms. Nunnally's house to get their jackets. As they returned from getting their coats, the [Petitioner] walked up, pointed the gun at the victim, and said, "Nigga, are you ready to die?" The [Petitioner] then shot the victim, who fell down. He pulled the trigger several more times, but the gun would not fire because the clip had been removed. The [Petitioner], who then ran away, was wearing a yellow shirt, black denim shorts, black Nike shoes, and black socks. Ms. Nunnally ran to a pay telephone and called 911. She then located the victim, who had run a short distance and fallen down, and she applied a blanket to his wound.

On cross-examination, Ms. Nunnally said that the [Petitioner] appeared intoxicated while he was at her house. She said that his speech was slurred and he was staggering. He also appeared to be intoxicated when she left her friend's house to get the jackets from her house. She said that when the police arrived, she was beside the victim, rendering aid.

Thomas Thompson testified that on the evening of April 13, 2001, he was in his house at 101 Byrd Street. At around 7:40 that night, he heard what sounded like a gunshot. He then looked out his window and saw a white man run between 714 and 716 Derry Street, fall down on the ground, and yell that he had been shot. Then Mr. Thompson looked behind Smith's Food Town on Derry Street and saw a black man in a yellow shirt run behind the store.

James Wheeler testified that at around nine o'clock on the night of April 13, 2001, a young black man, whom he identified as the [Petitioner], knocked on his door. Mr. Wheeler testified that the [Petitioner] was bleeding from his mouth, and he initially thought that the [Petitioner] had been in a car accident. However, the [Petitioner] said that he had been beaten up, and he asked to use the telephone. While Mr. Wheeler was inside his house retrieving a cordless phone for the [Petitioner], he decided to call 911 to have an ambulance come render aid to the [Petitioner]. When Mr. Wheeler went outside to give the [Petitioner] the telephone, he observed a car drive up with a young man and woman inside. Mr. Wheeler recognized the driver of the car as a man named Matt Kelly. The [Petitioner], who Mr. Wheeler said was "fidgety" and "obviously wanting to leave," got in the car with Mr. Kelly and drove away. On cross-examination, Mr. Wheeler testified that the [Petitioner] was having difficulty breathing and speaking because of the condition of his mouth.

David Williams, an officer with the Bedford County Sheriff's Department, testified that he accompanied the ambulance to Mr. Wheeler's residence in response to Mr. Wheeler's 911 call. As he was driving, he passed a white Honda Accord. Upon speaking with Mr. Wheeler, he learned that the subject had left in that car. Officer Williams then followed the Accord to the emergency room parking lot, where he stopped the vehicle. The [Petitioner] was in the back seat, and Officer Williams noticed that he had injuries to his face, he had blood down the front of his body, and he was not wearing a shirt. When the officer asked for his name, the [Petitioner] replied that his name was Simms. However, the driver of the car, Matt Kelly, told the [Petitioner] to tell the truth, and the [Petitioner] then told the officer that his name was Junior Woodard. Officer Williams

asked another officer, D'Angelo Inman of the Tennessee Highway Patrol, to pat down the [Petitioner] for weapons. Officer Inman located a Taurus .40 caliber semi-automatic pistol in the [Petitioner]'s pocket. The weapon had no clip in the grip. Officer Williams then placed the [Petitioner] in his patrol car and called for the city police. Officer Williams testified that he smelled alcohol on the [Petitioner], but that the [Petitioner] was coherent and had no trouble walking. Officer Inman, on the other hand, testified that he did not notice an odor of alcohol about the [Petitioner].

Back at the scene of the shooting, Rod Stacey was the patrolman with the Shelbyville Police Department who first arrived. He testified that he located a white male, whom he recognized as the victim, Scott Shafer, lying on the ground in between 714 and 716 Derry Street. Officer Stacey observed an entrance wound and an exit wound in the victim's left arm and an entrance wound in the victim's abdomen. Officer Stacey testified that the victim did not tell him who shot him or the circumstances surrounding the shooting.

Detective Eric Ely of the Shelbyville Police Department arrived on the scene after other officers had already secured the area and begun searching for evidence. He was directed to an area where David Williams of the Bedford County Sheriff's Department had located a shell casing earlier that evening. Detective Ely photographed the cartridge and took it into evidence. He testified that it was the casing of a .40 caliber bullet. At around 10:25 that evening, Detective Ely went to the hospital where other officers had the [Petitioner] in custody. There he received the Taurus pistol that Trooper Inman had found in the [Petitioner]'s pocket. Detective Ely stated that he read the [Petitioner] his rights. Noticing that the [Petitioner] had blood on his lip and some of his teeth were dislodged, he asked him, "What happened to your mouth?" The [Petitioner] replied, "I didn't shoot anybody." The detective testified that he did not smell alcohol on the [Petitioner] during this conversation. Later in his investigation, Detective Ely went to the office of the state medical examiner, where he received the bullet that had been removed from the body of the victim.

Teri Arney is a forensic scientist with the Tennessee Bureau of Investigation. She examined the shell casing found at the scene of the shooting, the bullet extracted from the victim's body, and the handgun found in the [Petitioner]'s pocket. She testified that the gun was a Taurus model PT140 .40 caliber semi-automatic pistol. She determined that the bullet and shell casing had been fired and ejected from the [Petitioner]'s gun.

-4-

Jeff Long is the EMT worker who administered medical aid to the victim. Mr. Long testified that when he encountered the victim, he was pale and sweating. The victim's lack of color indicated blood loss, and the perspiration indicated that he was beginning to go into shock. These signs suggested that the victim was bleeding internally and needed to be flown via helicopter to Nashville for surgery.

Jeffery Guy is a surgeon at Vanderbilt Hospital who treated the victim. He testified that the victim had extremely low blood pressure when he arrived at Vanderbilt. Despite the efforts of the surgical team, Scott Shafer died from blood loss as a result of gunshot wounds to the spleen, pancreas, and intestines.

Feng Li of the state medical examiner's office performed an autopsy on the victim's body on April 14, 2001. He testified that the victim died of gunshot wounds to different internal organs, and that all of the wounds had been caused by a single bullet. He also testified that no alcohol or drugs were detected in the victim's blood.

Rhonda Hill testified that her son Chris received a letter in May of 2001. She recognized the return address on the envelope as being the Bedford County Jail; so she decided to read the letter. The letter was dated May 23, 2001, the day after the [Petitioner]'s preliminary hearing. The letter was from the [Petitioner], who referred to himself as "Juvy." In the letter, the [Petitioner] stated that a girl named Shawn is "running her mouth."[1] The [Petitioner]'s letter asked Chris to prevent Ms. Nunnally from making the June 18 court date, which is the date on which the [Petitioner]'s case was presented to the grand jury. Finally, the [Petitioner] requested Chris to "hook up with Mickey and burn this [b----] house down." After reading the letter, Ms. Hill went to the police station and gave the police the letter. Henry Young, who was in jail with the [Petitioner], testified that he observed the [Petitioner] writing the letter. Mr. Young testified that after his preliminary hearing on May 22, 2001, the [Petitioner] mentioned LaShawn Nunnally's testimony and that it "needed to be taken care of."

After the State rested its case, the [Petitioner] testified on his own behalf. He stated that, on the afternoon of April 13, 2001, he had been out riding with the victim, Scott Shafer. The [Petitioner] had drunk three quarts of Budweiser beer in thirty minutes when he first joined the victim. After

---

[1] "Shawn" refers to LaShawn Nunnally.

-5-

the [Petitioner] left the victim's car, the [Petitioner] decided to walk to LaShawn Nunnally's house. When he arrived, the victim was already there. The two men exchanged words regarding whether the victim had tried to "holler" at the [Petitioner]'s girlfriend. At this point, the [Petitioner] testified that his gun was in his pocket. He handed the gun to Ms. Nunnally, and the argument between the [Petitioner] and the victim escalated into a fight. The victim punched the [Petitioner] in the mouth, and the two wrestled on the ground. During the fight, the [Petitioner] suffered a busted lip and lost a tooth. After the fight, the two men apologized to each other, hugged, and left in the victim's car. The [Petitioner] stated that when they left, Ms. Nunnally still had the gun.

The [Petitioner] and the victim then went to a store, where the [Petitioner] bought another quart of beer. After riding around for awhile, the two men returned to Ms. Nunnally's house. When they arrived, Ms. Nunnally and Mike Jones were there. The group was sitting on the front porch talking, when Jarmaine Hill showed up. Mr. Hill and Ms. Nunnally went inside the house for fifteen to thirty minutes. When Mr. Hill came back onto the front porch, he told the [Petitioner] that he wanted to speak with him. The two men walked down the street and talked. The [Petitioner] testified that when they returned, he sat back down on Ms. Nunnally's front porch. Then the [Petitioner] looked up and observed Mr. Hill pointing a gun at the victim. The [Petitioner] stated that Mr. Hill shot the victim. Mr. Hill ran away, but the [Petitioner] remained on the porch. At that time, Ms. Nunnally approached the [Petitioner], said "Here," and handed him the pistol. The [Petitioner] took the gun and ran. The [Petitioner] said that he ran past Smith's Food Town, and he stopped and knocked on the door of James Wheeler because he did not know how to get to his friend Matt Kelly's house. While he was at Mr. Wheeler's house, Matt Kelly drove up, and the [Petitioner] got in his car. The [Petitioner] testified that they drove to the hospital because he was concerned about the victim. Later on in his testimony, the [Petitioner] admitted writing the letter to Chris Hodge asking him to burn down the house of LaShawn Nunnally "to make her stop lying on [him]."

The defense called Jarmaine Hill as a witness, but he asserted his Fifth Amendment privilege against self-incrimination. Therefore, the trial court declared Mr. Hill unavailable, and the defense called Randall Lottie. Mr. Lottie testified that, while he was incarcerated with Mr. Hill, he heard Mr. Hill say that he killed Scott Shafer. Mr. Hill said that Mr. Shafer owed him money for drugs, and that another person was in jail for his crime.

*Dennis Cedric Woodard, Jr.*, 2003 WL 169082, at \*1-5.

On April 19, 2005, the Petitioner filed a pro se petition for post-conviction relief, alleging that he received the ineffective assistance of counsel. The Petitioner argued in his petition that the post-conviction court should toll the one-year statute of limitations because he did not learn the supreme court denied his application for permission to appeal until after the statute of limitations in which to file his petition for post-conviction relief expired. The post-conviction court determined that the petition was untimely and that tolling of the statute of limitations was not warranted. The Petitioner did not appeal the dismissal of the petition, but he filed a second petition on May 10, 2013, requesting post-conviction relief and a writ of error coram nobis. *See Dennis Cedric Woodard, Jr. v. State*, No. M2013-01857-CCA-R3-PC, 2014 WL 4536641, at \*5 (Tenn. Crim. App. Sept. 15, 2014), *no perm. app. field*. Although the Petitioner conceded his second petition was untimely, he requested tolling of the statute of limitations period in the interests of justice based upon his allegation that trial counsel deliberately deceived him by failing to disclose that counsel previously represented one of the State's witnesses. *Id*. at \*6. The Petitioner, likewise, alleged multiple grounds of the ineffective assistance of counsel. The post-conviction court dismissed the petition as untimely and did not render findings of fact or conclusions of law relative to the request for a writ of error coram nobis. *Id*. This court reversed the summary dismissal based upon the Petitioner's diligent pursuit of appellate relief and remanded the case for an evidentiary hearing on the post-conviction and coram nobis claims. *Id*. at \*11.

At the evidentiary hearing, trial counsel testified that he had practiced law for twenty-five years and that he had been an assistant public defender for sixteen years. Counsel said that he had worked in the public defender's office for two years at the time he represented the Petitioner. Counsel said that he investigated the Petitioner's case by interviewing witnesses, talking to the Petitioner, following up on discovery, and reviewing the autopsy and laboratory reports. He said he interviewed the police officers involved, although he did not have any records relative to their conversations. He said the physicians were interviewed before the trial, although he could not recall whether he or the investigator interviewed them.

Trial counsel testified that he previously represented Brooke Whitaker but not when he represented the Petitioner. Counsel said that relative to the Petitioner's case, he first heard Ms. Whitaker's name when he read the post-conviction petition. Counsel was unsure whether he knew the offense occurred near Ms. Whitaker's home and said that he did not know where she lived at the time of the offense and that nobody mentioned Ms. Whitaker's name in connection with the Petitioner's case.

Trial counsel testified that the Petitioner claimed he was innocent and that counsel determined a mental health expert was unnecessary relative to the Petitioner's intent at the time of the offense. Counsel knew about the Petitioner's juvenile psychiatric records and said that had an expert testified, the jury would have heard evidence the Petitioner had been previously diagnosed with "intermittent explosive disorder," which counsel described as "flying off the handle" and committing violent acts. Counsel said that he recalled the Petitioner had been previously evaluated for mental health reasons but did not recall the Petitioner's being hospitalized in a mental health facility. Counsel recalled that the Petitioner's diagnosis was depression caused by legal difficulties. Counsel said that based upon the diagnosis, requesting an expert was pointless. Counsel was unsure whether the trial court would have granted a request for expert funding.

Trial counsel testified that he did not obtain an expert to testify about the Petitioner's intoxication because the evidence showed the Petitioner had been drinking on the day of the offense. Counsel said that after reviewing the records and the witness statements and speaking with the Petitioner, counsel determined an intoxication expert was unnecessary.

Trial counsel testified that he was familiar with Henry Young, that he had represented Mr. Young, and that Mr. Young had been a long-time client of the public defender's office. Counsel denied, though, that he represented the Petitioner and Mr. Young simultaneously. Counsel said that the public defender's office represented Mr. Young before the homicide in the Petitioner's case, that Mr. Young pleaded guilty, and that Mr. Young, ultimately, violated the conditions of his community corrections sentence. Counsel said that at some point, Mr. Young incurred additional charges, that the public defender's office represented Mr. Young, that Mr. Young pleaded guilty, and that this charge occurred when the Petitioner's case was pending. Counsel said that after Mr. Young pleaded guilty in the subsequent case, counsel received the State's supplemental witness list in the Petitioner's case, which included Mr. Young. Counsel said that at that point, the public defender's office had ended its representation of Mr. Young.

Trial counsel testified that the Petitioner reported counsel to the Board of Professional Responsibility, alleging that counsel represented the Petitioner and Mr. Young simultaneously and that counsel advised Mr. Young to testify against the Petitioner. Counsel denied the allegations and said that the Board of Professional Responsibility opened an investigation and, ultimately, dismissed the complaint. Counsel admitted he represented Mr. Young while the Petitioner's case was pending but said he did not represent Mr. Young at the time of the Petitioner's trial. Counsel agreed he represented the Petitioner when counsel represented Mr. Young at an August 2, 2001 guilty plea hearing but said that he and the public defender's office had no information or knowledge that Mr. Young was involved with or connected to the Petitioner's case.

-8-

Counsel agreed the supplemental witness list relative to the Petitioner's case was received on October 5, 2001. Counsel said he did not file a motion to withdraw as the Petitioner's counsel because neither counsel nor the public defender's office represented Mr. Young when counsel learned Mr. Young was a State's witness at the Petitioner's trial. Counsel said he probably considered whether a motion to withdraw was necessary but said his office no longer represented Mr. Young. Counsel recalled that he received the supplemental witness list sixty days after his office ended its representation of Mr. Young and that no conflict of interests existed at that point. Counsel said that the Petitioner knew counsel represented Mr. Young because the Petitioner mentioned it to counsel.

Trial counsel testified that Mr. Young's testifying at the Petitioner's trial was not "as big a deal" as the woman who testified that she saw the Petitioner shoot the victim and that the woman was identified as a State's witness in the initial witness list. He said that although Mr. Young was not his client when counsel received the supplemental witness list, counsel spoke to Mr. Young, who said that he saw the Petitioner write a letter while Mr. Young and the Petitioner were confined in the jail. Counsel said co-counsel cross-examined Mr. Young at the trial. Counsel said that his office did not work on the Petitioner's appeal and that a private attorney was appointed for the appeal.

Trial counsel testified that the State obtained permission from the trial court to introduce a letter written by the Petitioner in which the Petitioner attempted to solicit the killing of Ms. Nunnally and that the defense did not object to the letter because the Petitioner admitted writing it. Counsel said that he received a notice of intent to introduce the letter and that a pretrial hearing was probably held, although he had no recollection of it. He agreed the transcript reflected that the parties discussed Mr. Young's testifying relative to the letter and that counsel told the trial court the defense had interviewed Mr. Young before the trial. Counsel said he told the trial court that he would object on the basis of relevance to questions about who represented Mr. Young when Mr. Young obtained his convictions. Counsel said the Petitioner was told that Mr. Young saw the Petitioner write the letter and would testify against the Petitioner. Counsel said that he last represented Mr. Young at a guilty plea hearing on August 2, 2001, and that during the plea negotiations, no discussion occurred about Mr. Young's receiving any benefit for testifying against the Petitioner.

Trial counsel testified that although he did not maintain records about how much time he spent on trial preparation, he estimated he spent at least forty hours preparing for the Petitioner's trial. Counsel said that he and the Petitioner discussed the possibility of an intoxication defense in conjunction with the Petitioner's mental health issues, although counsel did not specifically recall the conversation. Counsel initially believed the State extended a plea offer for second degree murder but said after reviewing his file and speaking to the prosecutor, that no offer was made to the Petitioner. Counsel recalled attempting to solicit an offer and focusing on the Petitioner's youth and psychiatric

problems as a basis for a guilty plea to a lesser included offense. Counsel said that the State believed it had adequate proof for a first degree murder conviction and that the Petitioner's only options were to plead guilty to first degree murder or to go to trial. Counsel said he spoke to the prosecutor and did not write correspondence during negotiations. Counsel agreed that his goal was to negotiate a plea agreement for anything less than first degree murder but that the prosecutor was unwilling to negotiate.

Trial counsel testified that he did not know when the defense received the letter the Petitioner wrote while in jail. Counsel did not recall what questions were asked of Mr. Young during co-counsel's cross-examination. Counsel also did not recall opening statements or closing arguments. Counsel was familiar with the name Jermaine Hill, although counsel did not know Mr. Hill personally. Counsel did not recall whether Mr. Hill was the person the defense identified as the perpetrator.

On cross-examination, trial counsel testified that before the Petitioner's trial, counsel did not know Ms. Whitaker but that counsel represented Ms. Whitaker multiple times after the Petitioner's trial. Counsel said that the Petitioner never mentioned Ms. Whitaker. Counsel agreed that the trial evidence showed that the Petitioner drank several "quarts" of beer on the day of the shooting and that the jury knew of the Petitioner's intoxication. Counsel said he did not want the jury to hear evidence of the Petitioner's intermittent explosive disorder diagnosis because counsel knew the trial evidence would show the Petitioner and the victim had an altercation hours before the shooting.

Trial counsel testified that he learned of Mr. Young's involvement in the Petitioner's case when the State filed its supplemental witness list and that generally, the State provided the defense with information about additional witnesses and how the witnesses related to a case. Counsel said that even if he had learned confidential information during his representation of Mr. Young, any confidential information learned would not have been to the Petitioner's detriment. Counsel agreed his and the public defender's office's practices were to contact the Board of Professional Responsibility to determine whether a conflict might prevent counsel or his office from representing a defendant. Counsel agreed that no discussions were held with Mr. Young about the Petitioner's case until the State filed its supplemental witness list. Counsel said the trial judge was told about counsel's previously representing Mr. Young.

Trial counsel testified that the letter written by the Petitioner while in jail was discovered by the State after the preliminary hearing and that the letter was postmarked May 24, two days after the preliminary hearing. Counsel said the Petitioner admitted writing the letter to Chris Hodge and requesting that Mr. Hodge kill Ms. Nunnally by burning her home. Counsel agreed that the extent of Mr. Young's trial testimony was that Mr. Young witnessed the Petitioner write the letter and that the Petitioner asked Mr. Young for assistance spelling a couple of words.

-10-

Trial counsel testified that had he sought to admit the Petitioner's mental health records, the jury would have heard evidence of the Petitioner's owning a firearm and firing the gun during a struggle with his father. Counsel agreed the evaluating psychiatrist would have been subject to cross-examination. Counsel said he was concerned about the psychiatrist's testifying about the Petitioner's disruptive, aggressive, and violent behaviors and about the psychiatrist's conclusion that the Petitioner did not have any mental health illness requiring inpatient treatment.

On redirect examination, trial counsel testified that he did not know Dana Brown and that he did not recall the name associated with the return address on the envelope of the Petitioner's letter to Mr. Hodge.

Upon questioning by the post-conviction court, trial counsel testified that Mr. Young did not disclose any impeachable conduct or prior bad acts during counsel's representation of Mr. Young. Relative to the Petitioner's letter, counsel said the Petitioner admitted writing the letter to counsel privately, and counsel thought the Petitioner was questioned about the letter at the trial.

Co-counsel testified that he had been a licensed attorney since 1999 and that his career had been devoted to criminal defense work. He recalled working on the preliminary hearing in the Petitioner's case but said trial counsel was the primary attorney. Co-counsel said that at the time of the Petitioner's case, co-counsel was relatively inexperienced, handled general sessions court, and assisted trial counsel in criminal court. Co-counsel recalled the Petitioner insisted on attempting to obtain a not guilty verdict and did not want to pursue an intoxication defense.

Co-counsel testified that Mr. Young was a witness for the State and that although the public defender's office represented Mr. Young before the Petitioner's case, the public defender's office did not represent the Petitioner and Mr. Young simultaneously. Co-counsel said that a conflict of interests existed if the public defender's office represented a defendant and a State's witness simultaneously. Co-counsel said that he cross-examined Mr. Young at the trial and that co-counsel asked Mr. Young if the Petitioner told him that Ms. Nunnally was lying and whether Mr. Young read the Petitioner's letter. Co-counsel agreed he did not ask Mr. Young about his burglary-related convictions and said the evidence about Mr. Young's previous convictions was elicited by the prosecutor on direct examination. Co-counsel said he cross-examined Mr. Young in an effort to gain experience, not because trial counsel might have had a conflict of interests.

Henry Young testified that the Petitioner was a friend and that they were confined at the same jail. Mr. Young said that just before the Petitioner's trial, trial counsel came to the jail to talk to Mr. Young. Mr. Young said that counsel had represented him a few

-11-

times. He said that at the time of the Petitioner's trial, he had a previous conviction for burglary and that counsel was his attorney. He said he received a two-year sentence, served one year in jail before being released, and returned to jail after being arrested for driving with a suspended license. He said that after his release was revoked, counsel came to the jail to talk to him. Mr. Young considered counsel his attorney at that time and said counsel asked what Mr. Young knew about the Petitioner's case. Mr. Young said he told counsel, "Nothing." Mr. Young said he told counsel that Mr. Young frequently assisted the Petitioner with writing letters. Mr. Young said he and counsel spoke about other topics, but he could not recall what they discussed. Mr. Young said that he did not know counsel represented the Petitioner at the time of their conversation. Mr. Young did not recall talking to the police or to the prosecutor about the Petitioner's letter.

On cross-examination, Mr. Young testified that he received a community corrections sentence upon being convicted of burglary in 1999, that he served one year in jail before being released to community corrections, that he violated the terms of his release, and that he was ordered to serve his sentence, which was enhanced to three years. Mr. Young said trial counsel represented him for the burglary charge and the community corrections violation. Mr. Young stated that he pleaded guilty to two counts of aggravated burglary on August 2, 2001, that he received an effective four-year sentence, and that counsel was his attorney. Mr. Young denied telling counsel that he committed crimes for which he was not charged while counsel represented him.

Mr. Young testified that trial counsel came to speak with him about the Petitioner's case, that counsel discussed the prosecutor's adding Mr. Young's name to the witness list relative to the Petitioner's trial, that counsel said the reason was based upon a letter, and that counsel asked what he knew about the letter. Mr. Young said that he did not regard the conversation as important or confidential at the time. Mr. Young agreed that the aggravated burglary cases had been resolved by plea agreement at the time counsel came to talk to him about the Petitioner's case but that he was unsure whether he had been sentenced. Mr. Young agreed the aggravated burglary judgments were entered on August 2, 2001, and that his case had ended when the Petitioner's trial began in October 2001. Mr. Young agreed that he did not return to court after he pleaded guilty to aggravated burglary. Mr. Young stated that at the time of the post-conviction hearing, he was on probation and that counsel was not his attorney for this matter.

The Petitioner testified that trial counsel and co-counsel visited him at the jail three times before the trial. The Petitioner said that as a juvenile, he used drugs, had a history with the police, and had obtained mental health counseling and treatment at two hospitals. The Petitioner agreed that he had been drinking on the night of the shooting and said that no physicians evaluated him before the trial. He agreed he testified at the trial and said had he known trial counsel had represented Mr. Young, the Petitioner

would not have testified. The Petitioner said information related to counsel's representing Mr. Young was "kept from" him. He said he learned counsel had previously represented Mr. Young about two years before the post-conviction hearing.

The Petitioner testified that he told trial counsel and co-counsel that he was not guilty but that the Petitioner did not discuss the details of the day of the shooting with counsel. The Petitioner said, though, he provided detailed information to defense investigators. He said he filed the instant post-conviction petition after learning that counsel previously represented Mr. Young and that a conflict of interests existed.

The Petitioner testified that the prosecutor engaged in misconduct at the trial by introducing the pending solicitation to commit murder charge stemming from the letter discussed during Mr. Young's trial testimony and that trial counsel and co-counsel did not object to the evidence because counsel had previously represented Mr. Young. Upon examination of the trial transcript, the parties agreed that a jury-out hearing was held and that the jury never heard evidence of the pending solicitation to commit murder charge. The Petitioner stated, though, his issue stemmed from counsel's failure to object to the admission of the letter in which Mr. Young assisted. The Petitioner said that he would not have testified at the trial had he known of the conflict of interests.

The Petitioner testified that during the trial, the attorneys and the judge had conferences in an office adjoining the courtroom and that he did not know what transpired. The Petitioner said the State extended a plea offer for second degree murder in exchange for twenty-five years at 85% service. He said that had he known of the conflict of interests he would have not gone to trial.

The Petitioner testified that trial counsel told the jury during opening statements that the Petitioner was innocent but that counsel presented evidence of intoxication. The Petitioner said that counsel did not retain an expert to establish his intoxication but rather attempted to introduce a toxicology report reflecting the Petitioner's intoxication level through the medical examiner. The Petitioner said that the report was not admitted in evidence because counsel could not establish the chain of custody and that the trial court would not permit counsel to present the witness who performed the analysis because counsel failed to provide notice of the witness's testimony. The Petitioner agreed, though, counsel cross-examined the medical examiner about the effects of the Petitioner's blood alcohol concentration of .235.

The Petitioner testified that he only received Randall Lotti's police statement before the trial. The Petitioner said that Brooke Whitaker and Evette McGee could have testified at the trial about his state of mind on the night of the shooting. The Petitioner said he told trial counsel about Ms. Whitaker because the shooting occurred at her home. The Petitioner said counsel also did not investigate the second bullet hole in the victim's

car.  The Petitioner said that counsel did not prepare a closing argument.  The Petitioner said counsel told the jury that his closing argument was based upon counsel's memory of the testimony and that if counsel said something incorrect, the jurors should rely upon their memories.

On cross-examination, the Petitioner testified that his defense was he did not shoot the victim and that he knew who shot the victim.  The Petitioner agreed that he wanted the jury to believe his testimony that he did not kill the victim and that he had a clear mind at the time of the shooting.  The Petitioner said, though, that counsel should have presented evidence of his intoxication at the time of the shooting because the "mitigating evidence" could have resulted in a "dismissal" of the murder charge.  He agreed the jury heard evidence that the Petitioner had consumed four quarts of beer and that he was intoxicated.

The Petitioner testified that had he "may have" pleaded guilty in exchange for twenty-five years at 85% had he known trial counsel represented Mr. Young.  The Petitioner agreed that counsel learned Mr. Young would testify about five days before the trial and said that he would not have proceeded to the trial with counsel regardless of whether the plea offer was still available had he known of the conflict of interests.  The Petitioner said he would have requested a new attorney because he would not have been able to trust counsel.  The Petitioner agreed that Mr. Young testified that the Petitioner wrote a letter and that the Petitioner testified he wrote the letter.  The Petitioner said the letter should not have been admitted at the trial because the trial was about LaShawn Nunnally's seeing the Petitioner shoot the victim and about the police officer's finding the murder weapon in the Petitioner's pants pocket.  The Petitioner said that he was not on trial for the solicitation charge and that the letter was irrelevant to the murder charge.  The Petitioner said that he would not have testified at the trial had he known counsel previously represented Mr. Young.  The Petitioner agreed that his defense of innocence would have been the same with another attorney.

The Petitioner testified that after the trial, he pleaded guilty to the solicitation charge related to the letter and that trial counsel represented him at the guilty plea hearing.  The Petitioner acknowledged he testified at the homicide trial that he wrote the letter and that he would have been convicted of solicitation had he gone to trial.

The post-conviction court denied relief.  Relative to the Petitioner's claim that trial counsel failed to investigate the circumstances of the Petitioner's case adequately and failed to gather exculpatory and mitigating evidence, the court found that the allegations were "mere conclusion[s]" without supporting evidence.  The court credited counsel's testimony and found that counsel reviewed the preliminary hearing testimony with co-counsel, who conducted the hearing, spoke with the investigating police officers and

-14-

witnesses, and reviewed the Petitioner's medical and psychological records. The court found that the Petitioner had failed to show any deficient performance or prejudice.

Relative to the Petitioner's claim that trial counsel and co-counsel failed to interview witnesses to the shooting and that counsel failed to interview and obtain exculpatory evidence from Evetta McGee, the post-conviction court found that Ms. McGee did not testify at the evidentiary hearing and that as a result, the Petitioner had failed to establish any deficient performance or prejudice. The court noted that Ms. McGee was incarcerated at the time of the post-conviction hearing.

Relative to the Petitioner's claim that trial counsel failed to present as a defense witness Brooke Whitaker, who would have provided exculpatory testimony, the post-conviction court found that counsel was unaware until the post-conviction hearing that Ms. Whitaker was a potential trial witness. The court found that Ms. Whitaker was not presented at the evidentiary hearing and that counsel did not provide deficient performance because Ms. Whitaker's name was not provided to trial counsel, although Ms. Whitaker was known to the Petitioner. The court found that the Petitioner presented no evidence that the outcome of the trial would have been different had Ms. Whitaker's testimony been offered. The court noted that Ms. Whitaker was incarcerated, along with Ms. McGee, for a rape committed at the Bedford County Jail.

Relative to the Petitioner's claim that trial counsel failed to investigate and employ the use of experts relative to the scientific evidence, the post-conviction court found that little evidence was presented at the evidentiary hearing that the use of experts would have had a reasonable probability of affecting the jury's verdict. The court found that the jury was presented with evidence relative to the Petitioner's consuming four quarts of beer shortly before the shooting and that counsel cross-examined the medical examiner about the effects of alcohol. The court stated that the Petitioner's claim that counsel was deficient by failing to obtain experts on the issue of intoxication to rebut proof of premeditation was "curious" based upon the claim counsel was deficient by changing the defense theory during the trial.

Relative to the Petitioner's claim that trial counsel was representing Mr. Young at the time of the Petitioner's trial, the post-conviction court found that counsel had previously represented Mr. Young but that the representation had ended before the Petitioner's trial. The court found that Mr. Young was not identified as a State's witness on the original witness list and that Mr. Young's name was provided to counsel days before the trial. The court noted that counsel's representation of Mr. Young ended on August 2, 2001, and found that counsel did not speak to Mr. Young regarding the Petitioner's case before the supplemental witness list was received by counsel. The court found that Mr. Young could not and did not receive any consideration for his testimony in the Petitioner's case because Mr. Young's case had been resolved by August 2.

-15-

Relative to the Petitioner's claim that trial counsel failed to disclose a conflict of interests regarding Mr. Young, the post-conviction court found that no conflict existed. The court found that counsel learned nothing from his representing Mr. Young that would have impaired counsel's ability to represent the Petitioner and that the issue was disclosed to the trial court when it arose. The court noted that the Board of Professional Responsibility dismissed the Petitioner's complaint. The court found that although counsel met with Mr. Young after the supplemental witness list was provided to the defense in October 2001, counsel did not advise Mr. Young to testify against the Petitioner. The court noted that counsel would have been negligent by not attempting to ascertain what Mr. Young knew about the Petitioner's case.

Relative to the Petitioner's claim that trial counsel failed to impeach Mr. Young's credibility with his previous felony convictions, other specific instances of conduct, and his benefiting from his testimony, the post-conviction court found that the prosecutor elicited testimony on direct examination about Mr. Young's convictions. The court found that counsel did not receive information about any specific instances of conduct that could have impeached Mr. Young's credibility and that no instances of conduct were presented at the post-conviction hearing. The court noted that Mr. Young testified at the hearing that he never disclosed to counsel any conduct that could have provided a basis for impeachment. The court found that Mr. Young's conversations with counsel were confined to Mr. Young's pending charges and that no evidence showed Mr. Young received any benefit for testifying at the Petitioner's trial.

Relative to the Petitioner's claim that trial counsel failed to impeach Ms. Nunnally with her prior inconsistent statements regarding the night of the shooting, the post-conviction court found that no evidence was presented regarding the allegation. The court found that the Petitioner did not present proof at the post-conviction hearing about what evidence counsel should have used to impeach Ms. Nunnally and whether the evidence would have had a reasonable probability of affecting the jury's verdict.

Relative to the Petitioner's claim that trial counsel failed to review laboratory reports and medical records and failed to obtain an expert to review these documents, the post-conviction court found that counsel reviewed these records and knew the Petitioner had been diagnosed with intermittent explosive disorder. The court determined that, given the nature of the first degree murder charge, presenting the records at the trial would have caused harm because the records discussed the Petitioner's violent tendencies. The court found that no evidence offered at the post-conviction hearing would have affected the jury's verdict if it had been presented at the trial. The court noted that the Petitioner adamantly claimed he was innocent and found that the chosen defense strategy resulted in the records having little evidentiary value.

Relative to the Petitioner's claim that trial counsel failed to procure funding for expert witnesses relative to the Petitioner's intoxication and mental state at the time of the offense, the post-conviction court found that counsel cross-examined the medical examiner on the effects of consuming alcohol. The court found that the jury heard evidence of the Petitioner's intoxication at the time of the shooting and that as a result, the evidence was presented to the jury. The court noted that the evidence of the Petitioner's intoxication and the effects of alcohol was immaterial because the Petitioner claimed he was innocent.

Relative to the Petitioner's claim that trial counsel failed to obtain an expert witness to challenge the medical examiner's conclusions in relation to other witness testimony, the post-conviction court found that no evidence regarding this allegation was presented at the evidentiary hearing. The court noted that the Petitioner did not identify the witnesses to which he referred in his petition.

Relative to the Petitioner's claim that trial counsel failed to choose a trial strategy based upon adequate investigation, the post-conviction court found that the Petitioner claimed he did not shoot the victim, rendering his mental health problems and intoxication at the time of the shooting immaterial. The court concluded that the Petitioner's guilt was established with "considerable proof" at the trial and found that the Petitioner forced counsel to defend the case based upon the Petitioner's innocence rather than by offering mitigating evidence that "might or might not have" resulted in a conviction for a lesser included offense. The court found that the Petitioner testified at the trial and at the post-conviction hearing that he was not guilty and identified Jermaine Hill as the perpetrator. The court found that Mr. Hill invoked his privilege against self-incrimination and that Randall Lottie testified about Mr. Hill's involvement in the shooting. The court found that the jury heard evidence that the Petitioner was not the shooter and that the jury's verdict reflects it rejected this theory.

The post-conviction court found that no evidence was presented to support the Petitioner's claim that trial counsel failed to prepare the Petitioner to testify at the trial. The court found that the Petitioner had failed to establish prejudice.

Relative to the Petitioner's claim that trial counsel abandoned the initial defense that the Petitioner was not the shooter and presented evidence at the trial of the Petitioner's intoxication as a means to negate the element of premeditation, the post-conviction court found after reviewing the trial transcript that counsel did not change defense strategy mid-trial. The court found that counsel's focus during the opening statement, the proof, and the closing argument was that Mr. Hill was the shooter. The court found that questioning the medical examiner about the effects of intoxication was not inconsistent with the chosen defense.

The coram nobis court also denied the petition for a writ of error coram nobis. Relative to the Petitioner's claim that trial counsel failed to disclose and intentionally concealed a conflict of interests, the court found that no new evidence was presented. The court found that although the record reflected a side-bar discussion was held with the trial judge, counsel, and the prosecutor, no evidence showed the Petitioner was present for the discussion. The court found that it was likely the Petitioner was unaware of the former representation and that the Petitioner would not have been at fault for not discovering the previous representation earlier. The court found, though, that the previous representation did not have an impact on the outcome of the trial. The court found that the previous representation had ended before the State supplemented its witness list to include Mr. Young and that Mr. Young and counsel did not discuss any conduct that could have been used to impeach Mr. Young. This appeal followed.

As a preliminary matter, the State argues the Petitioner is barred from receiving post-conviction relief. The State initially asserts that this court's previous opinion ordered an evidentiary hearing not on the merits of the Petitioner's allegations contained in the petitions but, rather, for the purpose of providing the Petitioner an opportunity to present proof of whether appellate counsel informed the Petitioner that the supreme court denied his application for permission to appeal because "[i]t appears that the petitioner's timely pursuit of relief was hindered by, if true, his appellate counsel not informing him of the denial of his application for permission to appeal to the supreme court in 2003." *Dennis Cedric Woodard, Jr.*, 2014 WL 4536641, at *11. We disagree with the State's interpretation of this court's instructions. This court concluded that "[c]onsidering the procedural situation and cumulative claims in this case, the record suggests that the petitioner has been 'pursuing his rights diligently' upon learning of such rights . . . and that due process at least requires that the petitioner be afforded the opportunity to present proof as to his claims." *Dennis Cedric Woodard, Jr.*, 2014 WL 4536641, at *11. This court determined that the statute of limitations was tolled and ordered an evidentiary hearing on the merits of the Petitioner's post-conviction and coram nobis allegations. We note the State did not file an application for permission to appeal to our supreme court.

Likewise, the State asserts that the post-conviction petition court's 2005 summary dismissal of the original petition as untimely prevents the Petitioner from obtaining post-conviction relief from the present petition. *See* T.C.A. § 40-30-102(c) (2014) (stating the Post-Conviction Act "contemplates the filing of only one (1) petition for post-conviction relief be filed attacking a single judgment"). However, Code section 40-30-102(c) also states, "If a prior petition has been filed which was r*esolved on the merits* by a court of competent jurisdiction, any second or subsequent petition shall be summarily dismissed." (emphasis added). The record reflects that the Petitioner's petition was not resolved on the merits, and this court concluded in the previous appeal that the Petitioner was entitled to an evidentiary hearing on the petitions for post-conviction relief and for a writ of error

coram nobis. *See Dennis Cedric Woodard, Jr.*, 2014 WL 4536641, at *11. We will consider the Petitioner's allegations on their merits.

## I.    Petition for Post-Conviction Relief

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

### A.    Ineffective Assistance of Counsel

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## 1.      Failure to Investigate Possible Defenses

The Petitioner argues that trial counsel failed to investigate adequately the viability of possible defenses associated with the Petitioner's mental health and intoxication. The State responds that the post-conviction court properly denied relief.

Trial counsel's credited testimony reflects that his investigation efforts included interviewing witnesses, talking to the Petitioner, reviewing the discovery materials, reviewing the autopsy and laboratory reports, and interviewing police officers and physicians. Counsel estimated spending forty hours preparing for the Petitioner's trial. Counsel testified that the Petitioner claimed he was innocent but knew who killed the victim. Although counsel reviewed the Petitioner's mental health records and was aware of the intermittent explosive disorder diagnosis, counsel concluded that a mental health expert was unnecessary because the defense strategy was that the Petitioner did not shoot the victim. Counsel concluded that evidence of the Petitioner's mental health was not relevant to the chosen defense and that presenting an expert to testify about the Petitioner's violent tendencies would have been detrimental to the Petitioner. The proof at the trial established that the Petitioner and the victim were involved in a physical altercation hours before the shooting, and counsel did not want the jury to learn of the Petitioner's violent behaviors. We note that the Petitioner did not present an expert witness at the post-conviction hearing to show how the use of his mental health history would have impacted the outcome of the trial notwithstanding his claim he was not the shooter. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Likewise, trial counsel considered the evidence of the Petitioner's intoxication and concluded that the Petitioner's intoxication on the night of the shooting was also irrelevant to the Petitioner's innocence defense. In any event, the record reflects that counsel presented evidence to the jury of the Petitioner's consuming four quarts of beer shortly before the shooting and that counsel questioned the medical examiner about the effects of alcohol, while maintaining the Petitioner did not shoot the victim. We note the Petitioner testified at the trial that he was innocent, that he saw Jermaine Hill shoot the victim, and that he had drank alcohol on the night of the shooting. The effects of the Petitioner's intoxication were minimally relevant to the chosen defense but nonetheless were before the jury for its consideration. Again, the Petitioner did not present an expert witness at the post-conviction hearing to show how the use of the Petitioner's intoxication would have changed the outcome of the trial notwithstanding his claim he was not the shooter, preventing him from establishing prejudice. *See Black*, 794 S.W.2d at 757.

The record supports the post-conviction court's findings that the Petitioner's claim of innocence rendered immaterial the Petitioner's mental health and intoxication and that the Petitioner's denial of involvement in the shooting prevented a defense of mitigating evidence in an effort to obtain a conviction for a lesser included offense of first degree murder. The record does not preponderate against the court's findings that counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

## 2.     Admission of the Petitioner's Handwritten Letter

The Petitioner argues that trial counsel failed to challenge the admission of the letter the Petitioner wrote while in the jail. He asserts that no trial witnesses identified the handwriting as the Petitioner's and that "it is possible that the State might not have been able to introduce the letter if counsel would have objected to its admission." The State responds that the post-conviction court properly denied relief.

The record reflects that the letter was read to jury by State's witness Rhonda Hill. She testified that she received the letter in the mail, although it was addressed to her son, Chris Hodge. She said that the return address was the jail and that the name associated with the return address was Dana Brown, Ms. Hill's former neighbor. Ms. Hill noted Mr. Brown's name was misspelled and said she opened the letter. The letter stated the following:

> Chris, . . . [t]his s--- is real. I need you to do something cause this stupid . . . b---- named Shawn is running her mouth, tell s---. Hey, I need you to stop this ho from making this court date, June 18th. Hook up with Micky and burn this b---- house down. Micky will tell you where the ho lives at. You dig. This is the ho that is making the charge, me with first-degree murder and this 51 top off. That's life. Stay on your feet. Much love, Juvy.

Mr. Young testified at the trial that he and the Petitioner were housed in the same cell block at the jail and that after the Petitioner's preliminary hearing, the Petitioner began writing a letter. Mr. Young stated that he knew "a little" about the letter's content and that the Petitioner was attempting to "get something taken care of with Shawn" Nunnally. Mr. Young said he saw the Petitioner writing the letter and that the Petitioner asked him how to spell a couple of words. Mr. Young identified the letter read by Ms. Hill as the letter the Petitioner wrote. Mr. Young said the Petitioner's nickname was "Juvy." On cross-examination, Mr. Young testified that he did not read the Petitioner's letter and that the Petitioner claimed Ms. Nunnally was lying to the police.

The Petitioner testified at the trial that he wrote the letter and admitted he asked Mr. Hodge to burn Ms. Nunnally's house because Ms. Nunnally was lying and because he was scared. The Petitioner said he did not know what else to do to make Ms. Nunnally stop lying about whether he shot the victim.

The record reflects that counsel did not object to the admission of the letter because the Petitioner admitted to counsel that he wrote the letter. The Petitioner testified at the trial that he wrote the letter, rendering a handwriting expert unnecessary. Likewise, the Petitioner did not deny writing the letter at the post-conviction hearing. In any event, the Petitioner did not present a handwriting expert at the post-conviction hearing, nor did he offer any evidence to show that he did not write the letter or that the letter was inadmissible. *See Black*, 794 S.W.2d at 757. Therefore, we conclude that the record does not preponderate against the post-conviction court's conclusion that counsel did not provide ineffective assistance of counsel. The Petitioner is not entitled to relief on this basis.

## B. Sixth Amendment Right to Counsel

The Petitioner contends that his Sixth Amendment right to counsel was violated because trial counsel simultaneously represented the Petitioner and Mr. Young, creating a conflict of interests. The State responds that the post-conviction court properly denied relief.

A criminal defendant is "entitled to zealous representation by an attorney unfettered by a conflicting interest." *State v. Thompson*, 768 S.W.2d 239, 245 (Tenn. 1989). "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see Thompson*, 768 S.W.2d at 245. A possible conflict of interests is insufficient to establish the constitutional violation. *Cuyler*, 446 U.S. at 350. "If an attorney actively represents conflicting interests, no analysis of prejudice is necessary; it is presumed that his divided interests adversely affected his representation." *Thompson*, 768 S.W.2d at 245.

No conflict of interests existed. The offense date in the Petitioner's case was April 13, 2001, and the trial occurred in October 2001. Trial counsel admitted previously representing Mr. Young and said his representation ended on August 2, 2001. Counsel was unaware of Mr. Young's connection to the Petitioner's case during counsel's representation of Mr. Young, and counsel and Mr. Young confirmed they never discussed the Petitioner's case during counsel's representation of Mr. Young. On October 5, 2001, more than two months after counsel ended his representation of Mr. Young, counsel received the State's supplemental witness list in the Petitioner's case, which indicated Mr. Young would testify at the Petitioner's trial. At that time, counsel did not represent

Mr. Young, and it had been two months since counsel had spoken with Mr. Young. Upon learning Mr. Young would testify at the Petitioner's trial, counsel spoke with Mr. Young, who provided limited information to counsel consistent with his trial testimony regarding the Petitioner's letter. Mr. Young testified at the post-conviction hearing that he did not regard this conversation with counsel as important or confidential. The record reflects that Mr. Young did not receive any benefit from the State in exchange for his testimony because his criminal cases had been resolved by August 2, 2001. We note the Petitioner did not present evidence that Mr. Young received any benefit from testifying at the Petitioner's trial.

Likewise, trial counsel and Mr. Young both testified at the post-conviction hearing that counsel did not advise him to testify against the Petitioner. Counsel's credited testimony reflects that counsel did not obtain confidential information relevant to the Petitioner's case during counsel's representation of Mr. Young and that counsel and Mr. Young did not discuss any prior bad acts, criminal conduct, or specific instances of conduct that could have been used to impeach Mr. Young at the Petitioner's trial. Nothing about counsel's representation of Mr. Young would have impaired counsel's ability to represent the Petitioner. We note that the Petitioner did not present any impeaching evidence at the post-conviction hearing and that the record reflects the prosecutor questioned Mr. Young on direct examination about Mr. Young's previous criminal convictions and criminal behavior.

As a result, the record does not preponderate against the post-conviction court's finding that no conflict of interests existed and that counsel did not fail to impeach Mr. Young properly. The Defendant has failed to show an actual conflict of interests existed, and he is not entitled to relief on this basis.

## II.     Petition for a Writ of Error Coram Nobis

The Petitioner asserts that trial counsel did not disclose the conflict of interests created by counsel's representing Mr. Young, that information related to the conflict of interests was intentionally concealed from the Petitioner, and that the Petitioner would not have proceeded to the trial with counsel as his attorney had he known of the representation.

Tennessee Code Annotated section 40-26-105(b) (2012) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a

showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a writ of error coram nobis are not limited to specific categories. *Harris v. State*, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at trial" so long as the petitioner establishes that he or she was "without fault in failing to present the evidence at the proper time." *Id.* at 592-93. In a coram nobis proceeding, the trial court first must consider the newly discovered evidence and be "reasonably well satisfied with its veracity." *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). If the defendant is without fault because the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial court must examine both the evidence presented at the trial and during the coram nobis proceedings to determine whether the new evidence may have led to a different result. *Id.* The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. *Id.* at 527-28.

The record reflects, as we have concluded above, that no conflict of interests existed because trial counsel's representation of Mr. Young ended on August 2, 2001, and because counsel did not obtain any information during his representation of Mr. Young that could have been used to impeach Mr. Young at the Petitioner's trial. Likewise, no evidence was presented at the evidentiary hearing reflecting that counsel concealed any conflict of interests from the Petitioner. The record shows that at the trial, a side-bar discussion was held between the trial judge, the prosecutor, and counsel relative to any potential conflict of interests and that the Petitioner was not present during the discussion. The trial court was informed of counsel's previously representing Mr. Young. Likewise, counsel testified at the post-conviction hearing that the Petitioner knew counsel had represented Mr. Young because the Petitioner mentioned it to counsel.

In any event, coram nobis relief is limited to matters involving "subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b). Evidence of a conflict of interests does not qualify as newly discovered evidence as contemplated by our statutes. Trial counsel's previous representation had no impact on the outcome of the Petitioner's trial because it had no relevance to whether the Petitioner shot and killed the victim. As a result, the Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the post-conviction and coram nobis court are affirmed.


_____
ROBERT H. MONTGOMERY, JR., JUDGE